Bess v. Commonwealth.

---

CASE 100—INDICTMENT AGAINST J. W. BESS FOR MURDER.—DEC. 2.

# Bess v. Commonwealth.

APPEAL FROM FAYETTE CIRCUIT COURT.

DEFENDANT CONVICTED OF MURDER AND APPEALS.    REVERSED.

MURDER—MOTIVE—ADMISSIBILITY OF EVIDENCE—DECLARATIONS OF DECEDENT—INSTRUCTIONS—IDENTIFICATION OF EVIDENCE REJECTED.

Held:    1. In a prosecution for the murder, on March 6th, of a paramour, where the proof is circumstantial, evidence that on December 23d decedent obtained insurance on her house and its contents, which were burned on January 20th, a few days prior to which defendant procured the removal of some of the goods, gratuitously paying the truckman's license fee to the city in addition to his regular charge, and that the loss was paid on February 28th, prior to which defendant had attempted to collect it on the false representation that the policy had been assigned to him, is admissible to show motive for the homicide.

2. In a prosecution for murder, the declaration of decedent a few days before the homicide, to a police officer, that defendant had $220 of her money which he refused to pay, and to recover which she spoke of getting a warrant out against him, is ad-

| | |
|---|---|
| 116 | 927 |
| 119 | 515 |
| 116 | 927 |
| 123 | 334 |
| j123 | 378 |
| 116 | 927 |
| 129 | 308 |

Bess v. Commonwealth.

missible, having been reported to defendant by the officer before decedent's demise.

3. In a prosecution for homicide, in which evidence was introduced tending to show that the motive was to obtain or retain money belonging to decedent, defendant's declaration that he wished to borrow twenty dollars of decedent, but that she made him a present of it, and gave him $200 more to keep, and that he afterwards, at her request, returned her $100, is admissible.

4. In a prosecution for murder, an instruction that "there may have been" evidence to show some other crime (the evidence not being indicated), and that, if such evidence proved defendant guilty of some other offense "against law or against morals," the jury should not "allow that fact, whatever it may be," to bias them or make them find defendant guilty under the indictment, except in so far "as the fact itself, whatever it may be" conduced to prove him guilty of the crime charged, and that it was the court's duty to tell the jury of the "rejection of certain testimony and the purposes for which other testimony was admitted" (without further identification of the evidence referred to), is so indefinite and ambiguous as to constitute error.

5. Where evidence is ordered rejected after it has gone to the jury, the court, in instructing as to its exclusion, should specify it in detail, and should name the witnesses from whom it has been elicited, in order to identify it.

6. Where evidence otherwise incompetent is admitted for a specific purpose, the court, without quoting it in detail or giving undue prominence to particular facts, should instruct the jury for what purpose alone the evidence is to be considered.

J. N. ELLIOTT AND HENRY G. SNYDER, ATTORNEYS FOR APPELLANT.

On the trial of this case we complain of the following errors to appellant's prejudice:

1. On December 23, 1902, deceased had taken a policy of insurance on her house for $225. The house was burned January 20, 1903. Evidence was admitted that prior to the fire, appellant, in the night time removed from the house nearly all the furniture, and tried, as agent for deceased, to collect the insurance money, but the company refused to pay him, but paid the deceased, Mrs Martin—also that appellant paid the driver of the wagon for hauling away the furniture before the fire, and paid his occupation license as driver to the city. This evidence was objected to by appellant, but was admitted

Bess v. Commonwealth.

as a motive or incentive to obtain the money of deceased with whom appellant had been living in adultery.

We contend this evidence was incompetent:

(1) It tends to connect deceased with the crime of arson for which offense he was not being tried, and is not competent unless the commission of one tends to establish the other, and the connection must be made "natural," "clear," "obvious," "logical," and "necessary." In other words, if the first crime is shown to have been committed by the accused, the mind must instinctively turn to the accused as the perpetrator of the second, and (2) if the commission of the one does not, in and of itself, tend to establish the second, there must be some other evidence showing that it tends to establish the second, and connecting the two crimes.

(3) This evidence, if admissible, was allowed to go to the jury without proper admonition by the court to the jury, as to its effect. The instruction given by the court as to this evidence, was one *general sweeping admonition*, indefinite and vague; leaving the mind in doubt as to what the court meant, when the rule requires it should be *specific, clear* and *distinct*.

(4) The Commonwealth's attorney, in his closing argument to the jury, used the following language in reference to the accused:

"He is a man destitute of all moral nature; he has been false in every relation of life; false to his wife, false to his children, false as a lover, false to his God; that he had never read in history or in fiction, nor had he ever known a man more depraved; that he had boasted of his amours with women, with a bravado that showed him to be guilty of every nature of crime against morality and decency, he was a whoremonger and seemed to be proud of it; that he was a moral degenerate, totally depraved, and had transgressed every law of decency." We submit that such inflammatory denunciation as this with the electric effect of the genius of oratory, could not have otherwise than an effect to inflame the jury, and should not be suffered to go to the jury without a reprimand from the court.

### AUTHORITIES CITED.

State v. Fisher, 124 Mo., 460 (27 S. W., 1109); State v. Babbst, 131 Mo., 328 (32 S. W., 1149; State v. Baker, 57 Kan., 541; (46 Pac., 947); State v. Young, 99 Mo., 666, (12 S. W., 879); O'Brien v. Com., 24 R., 2511.

CLIFTON J. PRATT, AND M. R. TODD, FOR APPELLEE.

Counsel for appellant rely on two alleged errors of the lower court for a reversal.

1. As to the admission of incompetent evidence. The court allowed the Commonwealth to prove that Mrs. Martin, the woman that was killed, took out a policy of insurance on her house and furniture, of $350 ($200 on the house and $150 on the contents) on December 23, 1902, and on January 20, 1903, the house was burned. The loss was compromised for $225, which was paid to Mrs. Martin. Previous to the burning, appellant, in the night time removed from the house nearly all the furniture. Appellant tried to have the insurance agent pay him the money but he refused to do it. There were no questions asked in this case as to whether appellant caused the building to be burned. We claim that this evidence was competent to show a motive for the homicide, and was admitted, under admonition of the court, for this purpose.

2. Conduct of the Commonwealth's attorney.

We insist that the Commonwealth's attorney was justified in addressing the jury as he did. Appellant, on his own motion on the witness stand, put his character in evidence. He stated on direct examination, "he was in the habit of taking his girls to the house of Patsy Mason; that he often hired conveyances to take disreputable women out riding; that he was in the habit of taking women to his room and keeping them all night; that he had two women which he slept with alternately every other night; that he was a married man with a wife and children, but was not living with them. He seemed proud of his career, and explained his damnable life with seeming delight, and it was within the province of the attorney for the State to comment and draw his own conclusions from such testimony.

We submit that in this case the evidence, which was all circumstantial, showed that the deceased, Mrs. Martin, had been taken to a pond and first strangled to death and then thrown into the pond, or reservoir, on Eddy street, in Lexington, where the body was found with marks on her neck indicating finger prints. No water was in her lungs, but they contained air, but no water. He was seen driving in that direction with a woman in a buggy about the time she disappeared, and in the buggy was found hair pins and a lock of hair the color of hers, and the buggy top was torn. Other circumstances were shown pointing to appellant as the guilty man. The evidence authorized the verdict of death. It was an infamous crime, and could only have been planned in the mind of an habitual

Bess v. Commonwealth.

criminal who had no regard in his own private life for decency.

We see no error of law by which the substantial rights of appellant were in any way prejudiced

### AUTHORITIES CITED.

Wills Circ. E., 39; Burrill Circ. Ev., 281-285; Rice on Evidence, secs. 278, 348, 155, p. 210; Hester v. Com., 85 Pa., 139; Goerson v. Com., 99 Pa., 388; Swan v. Com., 104 Pa., 218; Sheppard v. People, 19 N. Y., 537; O'Brien v. Com., 89 Ky, 354; Franklin v. Com., 92 Ky., 612; Martin v. Com., 93 Ky., 189; Snapp v. Comm., 82 Ky., 173; Davis v. Com., 6 Rep., 658; Howard v. Com., 24 Ky. Law Rep., p. 950; Cargill v. Com., 93 Ky., 578; Bishop v. Com., 22 R., 1161; Hourigan v. Com., 94 Ky., 520.

OPINION OF THE COURT BY JUDGE SETTLE—REVERSING.

The appellant, J. W. Bess, having been tried, convicted, and given the death penalty in the Fayette circuit court, under an indictment charging him with the murder of Martha McQuin Martin, by this appeal seeks a reversal of the judgment of conviction.

His motion for a new trial, which was overruled by the lower court, contains four grounds, viz.: First, that the court misinstructed, and refused to properly instruct, the jury; second, that the court admitted incompetent evidence, and rejected competent evidence; third, that the verdict is against the law and the evidence; fourth, that the commonwealth's attorney, in his closing argument to the jury, stated facts not in the record—by all of which the appellant's cause is alleged to have been prejudiced to such an extent that he did not have a fair or impartial trial.

As to the first ground it is only necessary to say that no error in the instructions has been pointed out in the elaborate briefs filed by counsel for appellant, and we are of opinion that none could be suggested, for they present with excep-

tional clearness and brevity all the law applicable to the facts brought out by the evidence. By them the jury were told in what state of case they would be authorized to find the appellant guilty of murder, voluntary or involuntary manslaughter, and what punishment appertained to each; also what would authorize a verdict of acquittal, and what would justify the application of the law of self-defense; while in and through them, separately and as a whole, ran the admonition to the jury to allow appellant the benefit of every reasonable doubt in the matter of determining his guilt or innocence, or, if they found him guilty, in determining the degree of his offense.

As the evidence in the case was in the main circumstantial, in order that we may satisfactorily pass upon the second alleged error complained of, it will be necessary to briefly review the facts upon which appellant's conviction was secured. On Tuesday, March 10, 1903, the body of Martha McQuin Martin was found in the reservoir on Eddy street in or near the city of Lexington, and was identified by persons who knew her well. When the body was removed from the water it was discovered that it contained several scratches on the forehead, and finger prints on the neck. According to the evidence of medical experts, the bruises on her neck were caused by violent pressure of her flesh, and the neck was limber, showing that it had been wrenched or strained. There was an abrasion of the skin over the left eye, sand or earth between the eye lids, and the eyeball was bloodshotten. The body was not bloated, and the post-mortem examination made by the surgeons showed that there was no water in either the lungs or stomach. They were in fact practically normal, and therefore in a healthy condition at the time of the woman's death. The contents of the stomach failed to show the presence of any poisonous substance or opiate.

According to the testimony of the surgeons, the bruises on the neck and face, the absence of water in the stomach and lungs, and the fact that the body was shriveled, instead of bloated, all went to prove beyond question that the woman's death did not result from drowning, but was caused by violent external means, such as suffocation from choking, or by the wrenching or straining of the neck; and, if her death was thus produced, it would seem to follow that her body was thrown into the reservoir by her slayer to make it appear that she had committed suicide. It appears from the evidence that an illicit intimacy had existed for two years between appellant and the deceased, during which time he had often spent his nights with her at her house, and she had frequently stayed at night with him in the room which he occupied away from his wife and children. On Friday before the finding of the body of the Martin woman the appellant, about the hour of noon, procured a horse and buggy at the livery stable of B. O. Horene, saying he was going out about the reservoir. There was a woman in the buggy with him when he left the stable. She was, as testified to by the stable men, unknown to them, but answered well in personal appearance and dress the description of the woman whose dead body was found in the reservoir. Others who saw appellant and the woman in the buggy that day after they left the stable testified to her resemblance to the body of the woman found in the reservoir. These witnesses seem to have given special attention to the hat and cape worn by the woman riding with appellant, and expressed the opinion that these articles of apparel were the same found on the body of the dead woman. One witness (J. H. Marshall, a letter carrier who knew Mrs. Martin) met appellant on the Friday in question as he and the woman who left the stable in the buggy with him were driving in a suburb of the city,

and recognized her as Mrs. Martin. When appellant returned the horse and buggy to the stable about 7 o'clock in the evening, the woman who had accompanied him when he drove from the stable was not with him. The buggy in which he took the afternoon ride had red wheels and body and a black top. When he returned it the top was down, and about 10 inches of the back torn out. He called the attention of the owner to the rent, but did not explain to him how it had been made. The same buggy was hired to one Ed. Murray soon afterwards, who found in it in the rear of the seat two hair pins and a hat pin, and also a strand of lady's hair. The hair was the color of Mrs. Martin's, and the hair pins and hat pin were afterwards identified by two of her acquaintances as like some that were owned by her. According to the evidence, no other woman besides the one with appellant rode in the buggy between the time of its return by him and the hiring of it to Murray, and it was not used by a woman while in Murray's possession. After returning the buggy mentioned, the appellant, about 10 o'clock of the same night hired at Horene's stable another horse and buggy, for the purpose, as he then stated, of going to a dance in the country after his son, whom he wished to have return home that night. He did not go that night for his son, but returned the horse and buggy to the stable at 11 o'clock, after an hour's use of it.

The evidence fails to show that Mrs. Martin was seen alive by any one after the buggy ride of Friday afternoon. It is true that one witness testified he knew her by sight, and was of opinion that he saw her pass on the opposite side of the street on Saturday, the day following the buggy ride, but his statement was indefinite, and by no means convincing. Three other witnesses—two of them dentists, and the third a lawyer—testified that they saw in their respective offices, at 5

o'clock Friday, afternoon, a woman whom they took to be Mrs. Martin, and one of the dentists said she told him her name was Martin; but the Commonwealth introduced in rebuttal Georgia Driscoll, who it was proved strongly resembled Mrs. Martin, and she testified that she was the woman who went to the offices of the dentists and lawyer on Friday afternoon. The, latter were recalled, and all three of them, upon seeing Georgia Driscoll, positively identified her as the woman they took to be Mrs. Martin, the dentists being able to identify her by a decayed tooth of peculiar shape, which they found in her mouth, and which had been examined by them on the Friday afternoon in question.

Further evidence that the death of Mrs. Martin occurred on Friday afternoon or night was furnished by the testimony of a witness living near the reservoir that he saw the clothing of the dead body floating on the surface of the water on Saturday morning, the day following the buggy ride with appellant, but without knowing or taking the trouble to ascertain what it was. What was supposed to be a bundle of old clothes was also seen in the reservoir by others on Sunday, Monday, and Tuesday, but they, too, were ignorant as to what the object was, until the body was removed from the water.

The medical experts and others informed on the subject testified that in case of death by drowning the body invariably sinks, and will not arise to the surface earlier than three days, but that a dead body thrown into the water will not sink; and the physicians further testified that, in their opinion, the woman whose body was found in the reservoir had been dead from twenty-four to seventy-two hours when the body was removed from the water. There was much testimony to the effect that appellant after the death, and before the finding of the body of the deceased, informed a number of his acquaintances that she had gone from Lexington to

Seattle, Cincinnati, or Indianapolis is company with anoth-
er man, and that he (appellant) had quarreled with her, and
they had agreed to have nothing more to do with each other.
He also informed one or more persons that the deceased had,
on one occasion, tried to shoot him, and that she was a "mor-
phine dope," and was liable to commit suicide. One George
Bradley testified that he had a conversation with appellant on
Wednesday or Thursday before the finding of the body of the
deceased, in which he (appellant), in speaking of the deceased,
who was then in his room over the barber shop, said he want-
ed to get rid of this woman up there, and upon being asked
"what for," he said he was "afraid she might kill herself
up these stairs, and it might be pretty bad." There was also
other evidence that after the death and before the finding of
the body of the deceased he took some of her personal effects
that were in his room, such as a sewing machine and wear-
ing apparel, and distributed them among the colored female
residents of the neighborhood. It was also proved that ap-
pellant, after his arrest, voluntarily made several contradic-
tory statements that were inconsistent with his innocence,
and on the trial a note was introduced in evidence, which he
had written, while in jail, to a Mrs. Porter, in which he tried
to induce her to testify in his behalf that she was the woman
with whom he drove in the buggy from the livery stable on
the Friday afternoon before the finding of the dead body of
Mrs. Martin, and that it was on her account, and to carry
her home through the rain, that he again procured of the
same stable the buggy at ten o'clock that night; but she re-
fused to make the desired statements, and on the witness
stand denied their truth.

The trial court permitted the Commonwealth to prove that
the deceased, on December 23, 1902, obtained a policy of fire
insurance of $350 on her house and its contents, that the

house and what was in it was destroyed by fire on January 20, 1903, and that the loss was compromised on February 28th by the payment to the deceased of $225 by the insurance company. The Commonwealth was also allowed to prove that the appellant, only a few days before the house was burned, procured a wagon and driver, and at night hauled away from the house various articles of furniture and other property, including the sewing machine that he gave away, after the death of Mrs. Martin, which he had caused to be taken to the room occupied by him as a sleeping apartment, and for the services then rendered him by the driver and team he paid the driver one dollar, and shortly thereafter and after the burning of the house, without any request from the driver to do so, he offered to and did pay for him to the city government six dollars for a license to carry on the business of hauling with his express wagon in the city of Lexington. The Commonwealth was further allowed to prove that the appellant attempted to collect of the agent of the insurance company the $225 which it had agreed with the deceased would be paid her for the loss of her house and contents. The agent testified that appellant informed him that he had an order from the deceased for the sum due her, and that the policy had been transferred to him, but the agent refused to pay the money to him, and shortly thereafter paid it to the deceased, who then surrendered to the agent the policy, which had not been assigned to appellant as claimed by him The payment was made to her on February 28, 1903. Her dead body was found on March 10th following. So if, as the evidence strongly conduced to prove, her death occurred on Friday of the previous week, which was March 6th, it is apparent that the insurance money was received by the deceased only six days before her death. If there was fraud or crime in the burning of Mrs. Martin's house, the evidence referred

to conduced to show that the appellant had some guilty con-
nection therewith.

The agent of the insurance company testified that the sum
due the deceased on her loss was paid in two $100 bills, a
twenty dollar and a five dollar bill, and it was stated by the
appellant on the witness stand that he informed the deceased
that he wished to borrow the twenty dollar bill which she re-
ceived of the insurance agent, but she made him a present of
it, and gave him the two $100 bills to keep, and that when he
went to his room that night he found her there, and at her
request returned her the two $100 bills.

Luke Doyle, a policeman, testified that the deceased, about
a week before her death, complained to him that appellant
had her money, and she could not get it, and they had some
talk about causing his arrest. Shortly thereafter he saw her
intercept appellant on the street, and what appeared to be an
angry altercation took place between them. On the after-
noon of that day appellant went to the witness, and asked
him what Mrs. Martin had said to him, and was told by the
witness of his conversation with Mrs. Martin, and that she
had said he had $200 of her money. Appellant did not deny
that he had her money, but said it was merely a breach of
trust, and that she could not do anything unless he wanted
to give it back to her. On several days in succession the wit-
ness said he was talked to by appellant about the matter,
and at one time was told by him that he had not given her
back the money, but thought he would, and later told him
that he had given her $100 of it. On Thursday appellant
again met the witness on the street, and asked him if he
had seen deceased, and said he was afraid she would shoot
him, and on Friday morning (which was the day on the af-
ternoon of which the deceased, according to the evidence, lost
her life) appellant inquired of witness whether he had seen

deceased, and informed him of her having tried to commit suicide, and was told by the witness that she had probably done so, and nobody knew anything about it. To one or two others appellant said he had returned to the deceased $100 of her money, but no money was found on her body when removed from the water, though one of her stockings was found to be released from the suspender and pulled down, and one of her female acquaintances testified on the trial that she had known deceased to carry money in her stockings.

The appellant, in testifying before the jury, made a general denial of nearly all of the facts brought out by the witnesses for the Commonwealth, but seeemed to have but little support from other witnesses introduced in his behalf.

It is insisted for appellant that it was error to allow the introduction of evidence in regard to the insurance upon the house and household effects of the deceased, and of the conduct of the appellant in removing the furniture and other property from the house, to which the driver of the express wagon testified, or to allow the introduction of evidence as to what passed between the appellant and the driver in regard to the payment by the former of the latter's license, and likewise error to permit the introduction of evidence in regard to the burning of the house, or as to the payment to the deceased of the insurance money, or the attempt on the part of the appellant to collect it. We are of the opinion that all of the evidence mentioned was competent to show a motive for the homicide. If the appellant took the life of the deceased, the crime was not committed without motive. There are, indeed, few motiveless crimes, and among the motives impelling men to crime is gain. In Burwell on Cir. Ev., section 285, it is said: "The motive of gain, in a stricter sense of the term, may exist by two different classes of objects: First, by something visible and tangible, which the party medi-

tating the crime desires to possess; and, secondly, by some substantial benefit which is expected to accrue as a result of the comtemplated act." In O'Brien v. Commonwealth, 89 Ky. 354, 11 R., 534, 12 S. W., 471, this court said: "Necessarily, where the commission of crime can be shown only by proof of circumstances, the evidence should be allowed to take a wide range, otherwise the guilty would often go unpunished. It is true there must be some connection between the fact to be proved and the circumstances offered in support of it, yet any fact which is necessary to introduce or explain another, or which afforded an opportunity for any transaction which is in issue, or shows facilities or motives for the commission of the crime, may be proved. Even evidence tending to prove a distinct offense is therefore admissible if it shows facilities or motives for the commission of the one in question. . . ." In a more recent case decided by this court, the style of which is also O'Brien v. Commonwealth, 115 Ky., 608, 24 R., 2511, 74 S. W., 666, the authorities bearing on the question under consideration are elaborately reviewed, and no better statement of the principle involved can be found than is contained in Bishop's New Crim. Proc., vol. 1, section 1126, quoted with approval in the opinion in that case: "The intent, knowledge, or motive under which the defendant did the act charged against him not generally admitting of other than circumstantial evidence, may often be aided in the proof by showing another crime actual or attempted, then it is permissible." We find, therefore, that the true doctrine deducible from the foregoing authorities is that all the evidence admitted must be pertinent to the point in issue, and, if it be pertinent to the point, and tends to prove the crime alleged, it is not to be rejected, though it also tends to prove the commission of other crimes, or to establish collateral facts. If there was a conspiracy between the deceased and the de-

fendant to insure her property and then destroy it to secure the insurance, and by that means the insurance money, or some part of it, went into appellant's hands, when it became apparent to him that deceased would compel its return to her even by his arrest, who can say whether the murder, if committed by him, resulted as a means of preventing his arrest for some connection with the burning of her house or to enable him to keep the money? In either event the motive would be manifest. At any rate, it was for the jury to determine from all the evidence whether or not either motive existed, and we think for this reason that the evidence complained of was competent.

We are, however, of opinion that the trial court erred to the appellant's prejudice in not explaining to the jury the full purpose and effect of this evidence. The admonition of the trial judge to the jury on this point, as found in the bill of evidence before us, is as follows: "Gentlemen of the jury, there have been certain witnesses who have testified in this case about statements purporting to have been made by Mrs. Martin. As to that evidence, and whatever evidence has been given to you as to any statements made by Mrs. Martin, that evidence ought to be altogether disregarded by the jury, as if it had not been heard. Her statements, if made as detailed by any witnesses, are not competent testimony, and the jury should disregard it entirely. There may have been evidence in this case tending or not, as the jury may think, to show that the defendant has been guilty of some other crime or offense than the one charged in the indictment. In so far as any evidence of that kind has been admitted, it should not bias the mind of the jury; nor your belief, if any you have, that this defendant committed some other offense than the one charged in the indictment, lead you to find a verdict against him upon this charge, except in

so far as the fact itself, whatever it may be, throws light upon the charge in this indictment. That is to say, if you believe from the evidence that some other offense, either against the law or against morals, has been proved against the defendant, you ought not to allow that fact, whatever it may be, as competent evidence for you to consider in so far as it bears upon this charge, but it should not bias your mind, and make you find this defendant guilty in this indictment, any more than if it had not been admitted, except in so far as the fact itself, whatever it may be, conduces to prove the defendant guilty of this charge; and it is my duty that I should tell you as to the rejection of certain testimony, and the purpose for which certain other testimony is admitted, and you owe it to yourselves as jurors to maintain your solemn oath, and be governed by the injunction of the court." By this charge the jury were directed to disregard all statements detailed by the witnesses as emanating from Mrs. Martin. The greater part of her statements were incompetent for any purpose, but some of them were manifestly competent; such as her conservation with the policeman, Luke Doyle but a few days before her death, in which she complained to that officer that appellant had $220 of her money, which he refused to pay her, and to recover which she spoke of getting out a warrant against him, for that conversation was reported by Doyle, to appellant before the death of Mrs. Martin. The ruling of the court likewise excluded from the consideration of the jury the statements of the appellant relative to the alleged declarations of Mrs. Martin as to her purpose in placing in his hands the money received by her of the insurance company, made to him at the time the money was given him. We think these declarations were competent for the purpose of explaining the circumstances under which appellant received the money, and also to contradict the state-

Bess v. Commonwealth.

ment made by Mrs. Martin in her conversation with Doyle which the latter subsequently reported to appellant. It is true that the exclusion of the testimony of Doyle as to the statements made to him by Mrs. Martin was not prejudicial to the appellant, but we are unable to say that the exclusion of the latter's testimony as to the declarations of Mrs. Martin accompanying the placing of the money in his hands was not so. We are of the opinion that the admonition of the circuit judge was so indefinite and ambiguous that it was, on the whole, more calculated to confuse than to enlighten the jury. It was an attempt by the court to instruct the jury as to the consideration to be given evidence that "may have been" admitted in the case, which, in their opinion, might or might not tend to prove the appellant guilty of some crime or offense other than that charged in the indictment, without indicating what evidence had been introduced that was likely to superinduce such an opinion, or what crime or offense other than that named in the indictment was referred to. The jury were also told, in effect, that, if the evidence thus vaguely referred to proved the appellant guilty of some other offense "against the law or against morals," they ought not to "allow that fact, whatever it may be," to bias their minds, or make them find the appellant guilty under the indictment, any more than if it had not been admitted, except in so far "as the fact itself, whatever it may be," conduced to prove him guilty of the crime with which he was charged. This part of the charge is but a repetition of what went before, and is well calculated to further obscure the meaning of the court and mislead the jury.

Near the conclusion of the admonition the jury were further told by the court that was his duty to tell them of the "rejection of certain testimony and the purpose for which certain other testimony was admitted;" but neither in that

connection, nor elsewhere in the admonition, except as to the statements of Mrs. Martin, already referred to, was it stated what evidence was rejected, although there was other evidence rejected by the court. The trial judge should have admonished the jury in explicit language what evidence was excluded from their consideration, specifying it in detail; and, if its rejection was not ordered until after it had gone to the jury, it would have been proper for the court, in excluding it, to name the witnesses from whom it had been elicited, in order that the jury might the better understand what evidence, and how much of it, was not to be considered by them. But when evidence otherwise incompetent is admitted for a specific purpose, a somewhat different rule should obtain. In that event, the trial judge in apt language, and without quoting it in detail, or giving undue prominence to particular facts, should inform the jury for what purpose alone the evidence is to be considered by them. Pursuant to this rule, the jury in the case at bar should have been told by the court that, though they might believe from the evidence beyond a reasonable doubt that the burning of the house of Mrs. Martin was done, or procured to be done, by her, with the felonious intent to thereby defraud the insurance company of the amount for which the same or its contents was insured, and further believe from the evidence beyond a reasonable doubt that the appellant, with like intent and purpose, did aid, assist, and advise her in such burning, if any, such of the evidence, if any, as tended to prove that fact, might be considered by the jury, in connection with all other evidence in the case, only in determining whether or not the appellant had, or was thereby furnished, a motive for the murder of Mrs. Martin. As a further safeguard to the rights of the appellant, and by way of putting the admonition in another form, the court might also have told the jury that none of the

evidence in regard to the burning of the house, the removal of its contents, or any part thereof, by the appellant, before the fire, or as to the payment by the insurance company of the loss thereon—though they might believe from such evidence beyond a reasonable doubt that appellant was a guilty participant in the crime, if any, of burning the house, or the fraud, if any, thereby practiced upon the insurance company—should be considered by them, except for the sole purpose of determining whether or not it conduced to prove a motive on the part of appellant for the murder of Mrs. Martin. In the same manner, and with equal circumspection, the court should have admonished the jury as to the purpose for which they might consider the evidence in regard to the illicit relations that existed between the appellant and Mrs. Martin at the time of her death and for the previous two years.

We find but little merit in the objection urged by the appellant to the statements of the Commonwealth's attorney set forth in the bill of exceptions. The language complained of was severe in its arraignment of the appellant, but not abusive, and we are unable to say that it was not warranted by the evidence. The conduct of the appellant, as shown by the evidence, his admissions, while upon the witness stand, of moral turpitude, much of which was voluntary and unnecessary, afforded justification for what was said by the Commonwealth's attorney.

Because of the error of the trial court in failing to properly admonish the jury as to the effect and purpose of the evidence that was competent only to show motive, and of its further error in rejecting evidence of certain of the statements of Mrs. Martin, the judgment is reversed, and cause remanded, with directions to the lower court to set aside the verdict

and judgment and grant appellant a new trial, and for further proceedings consistent with the opinion herein.