## STATE v. DE WEESE.

No. 3188. · Decided March 8, 1918. (172 Pac. 290.)

1. JURY—QUALIFICATION—EXAMINATION. Although a juror on his voir dire stated that, if defendant could prove his innocence, it was his duty to do so, where he afterwards stated that what he meant was that such duty devolved on defendant only after the state had proven him guilty beyond a reasonable doubt, and that if court so instructed he would acquit defendant unless defendant's guilt was established beyond a reasonable doubt, the juror qualified himself, and defendant was not prejudiced by denial of challenge. (Page 522.)

2. CRIMINAL LAW—HARMLESS ERROR—EXAMINATION OF JURORS. A prospective juror, in answer to questions propounded by the court, stated that he had formed an opinion as to the guilt or innocence of defendant, that he retained such opinion, and that it was strong and fixed. When asked if, notwithstanding such opinion, he could act impartially and fairly on the evidence admitted, the juror answered, ''It would have to be pretty strong and the man produced who really did it.'' Finally the court asked just what the nature of his prejudice was. The juror answered, ''Well, I believe a burglar would do most anything.'' The juror was excused, but defendant complains that because of the standing and influence of the juror the answer forced by the court in the presence of other jurors was prejudicial to defendant. Defendant's counsel interposed no objection and made no request that jury be instructed to disregard answers. *Held,* that the jurors which had been selected were not prejudiced by the proceedings complained of. (Page 523.)

3. CRIMINAL LAW—APPEAL—PRESUMPTION—INTELLIGENCE OF JURORS. It will be assumed on appeal that jurors selected at the time a prospective juror on his voir dire stated his reasons for his prejudice were men of ordinary intelligence, with minds of their own, conscientious in respect to their duties, as demonstrated by their answers during the course of their examination. (Page 524.)

4. JURY—DEATH OF JUROR—FILLING VACANCY—FURTHER PEREMPTORY CHALLENGES. Under Comp. Laws 1907, Section 4873, providing that if, before the conclusion of a trial, a juror becomes sick so as to be unable to perform his duty, the court may order him to be discharged, in which case a new juror may be sworn, and the trial begin anew, or the jury discharged and a new jury then or afterward impaneled, where one of the jurors died after a substantial part of the state's evidence had been introduced, and the attorneys stipulated that a new juror be sworn, defendant, who had exhausted his peremptory challenge when the situation arose, would not be entitled to one or more additional peremptory challenges. (Page 524.)

5. STATUTES—ADOPTION FROM ANOTHER STATE—CONSTRUCTION. The rule that, where a statute is adopted from another state, the construction placed upon it by the courts of such state prior to adoption is likewise adopted, does not go so far as to compel the adoption of a construction which is inconsistent, unreasonable, and unwarranted. (Page 526.)

6. CRIMINAL LAW—HOMICIDE—EVIDENCE—OTHER OFFENSES—MOTIVE. In a prosecution for murder, where the victim, defendant's wife, knew more or less of the details of other crimes committed by defendant, and admitted by him in a written admission assumed to be written in order that those concerned might have first-hand information, and there was evidence of bitter feelings between the parties,

making it highly probable that the wife, who had it within her power to make trouble for defendant, might turn against him, a situation of vital interest to defendant was shown, one from which a motive might be inferred, and to establish such motive the other crimes of defendant, as admitted by himself, became material evidence in the case.[1] (Page 527.)

7. CRIMINAL LAW—OTHER OFFENSES—MOTIVE. If commission of other crimes by defendant, of which his wife, the victim of the homicide, had knowledge, offered any motive, defendant's admissions thereof were admissible, it being for the jury, and not for the court, to say whether the motive disclosed was adequate. (Page 534.)

8. CRIMINAL LAW—OTHER OFFENSES—WRITTEN ADMISSIONS. Where a document written by defendant, in order that those concerned might have first hand information, contained many admissions, in addition to admissions as to commission of other crimes by defendant, which were not inadmissible from any point of view, and admissions as to occurrences both before and after murder of defendant's wife and in explanation thereof, which were clearly relevant, and not obnoxious to defendant's objection that proof of other crimes would prejudice the jury, it was not error to admit the document as a whole, where the court and counsel studiously adopted every precaution to prevent the evidence from being used for any other purpose than to show motive. (Page 535.)

9. CRIMINAL LAW—INSTRUCTIONS LIMITING APPLICATION OF EVIDENCE. Where defendant did not ask for a deletion or segregation, but objected to the written document in its entirety, and to have excluded the document would have deprived the state of evidence to which it was entitled, the proper procedure was to admit the document and limit its application by proper instructions.[2] (Page 536.)

10. CRIMINAL LAW—APPEAL—PREJUDICIAL ERROR—PRESUMPTION. In a prosecution of defendant for the murder of his wife, the district attorney, in the peroration of his closing argument to the jury, said: "God Almighty, thousands of years ago, on Mount Sinai, declared what the law was, and we read in the Good Book that God said, 'Thou shalt not covet! Thou shalt not lie! Thou shalt not commit adultery! Thou shalt not kill!' Gentlemen of the jury, this man (pointing to defendant) has committed all these crimes. This self-confessed burglar has all his life laughed and scoffed at the law, at the officers of the law, and if you turn him loose he will laugh and scoff at you." There was no exception taken to the remarks, no objection raised then, nor was there any objection made until

---

[1]*State* v. *Anselmo*, 46 Utah, 137, 148 Pac. 1071.

[2] *State* v. *Greene*, 33 Utah, 497, 94 Pac. 987; *Groot* v. *Railroad*, 34 Utah, 152, 96 Pac. 1019.

several weeks after the close of the trial. *Held,* that the court on appeal could not presume that defendant was prejudiced by remarks. (Page 537.)

11. CRIMINAL LAW—APPEAL—TIMELY EXCEPTIONS—ARGUMENT. Remarks of counsel in arguing a case to the jury, if deemed prejudicial, must be excepted to at the time they are made, to give the court opportunity to correct as far as possible any prejudicial effect. (Page 537.)

12. HOMICIDE—FIRST-DEGREE MURDER—SUFFICIENCY OF EVIDENCE. Evidence *held* to sustain a conviction of murder in the first degree. (Page 538.)

13. CRIMINAL LAW—JUDICIAL NOTICE—MOTIVE—CUPIDITY. Cupidity is everywhere recognized as one of the most powerful motives to human action. (Page 539.)

Appeal from District Court of Salt Lake County, Third District; *Hon. J. Louis Brown,* Judge.

Howard De Weese was convicted of murder in the first degree. He appeals.

AFFIRMED.

*Burton W. Musser* and *John A. Beck, Jr.,* for appellant.

*Dan B. Shields,* Atty. Gen., and *James H. Wolfe* and *O. C. Dalby,* Asst. Attys. Gen. for the State.

THURMAN, J.

The defendant, Howard De Weese, charged in the information as D. C. Robbins, was convicted in the district court of Salt Lake County of the crime of murder in the first degree, committed at Salt Lake City on the 22d day of September, 1916. The defendant was sentenced to be executed, and has appealed to this court, assigning numerous errors alleged to have occurred during the impaneling of the jury and the trial of the case. These alleged errors relate to rulings of the court in impaneling the jury, the admission of certain evidence over the objections of the defendant, and remarks of the pro-

secuting attorney, alleged to be prejudicial, in his closing argument to the jury. More specific reference to these alleged errors will be made later on in this opinion.

The victim of the homicide was the wife of the defendant, and the circumstances attending the commission of the crime conclusively show that it was a most brutal and atrocious murder. The murder was committed at an apartment house, No. 455½ South Second East Street, Salt Lake City, early on the morning of September 22, 1916.

On the 20th day of September, two days before the murder, the defendant and his wife, under the names of Mr. and Mrs. D. C. Robbins, rented the apartment from the proprietress, Miss Hattie Anderson, who was afterwards a witness in the case. The entrance to this apartment was from the rear. It consisted of a front room, which was also used as a bedroom, containing a sanitary couch about the size of an ordinary double bed, covered by a mattress, sheets, pillow, etc., also a dresser, some chairs, and probably other furniture not necessary to describe. The other room was used as a kitchen, containing a gas range and other kitchen furniture. There was also a bathroom used by the occupants of this apartment in common with other tenants in the building, and a common hall leading to the several rooms, so that each of the occupants had access to the bathroom without disturbing the other occupants, and likewise to the doors of each of the other apartments. Defendant and his wife rented the apartment on the 20th day of September, as above stated, and paid the rent for one week in advance. They then left the apartment, returning later in the day with their baggage. But little was seen or heard of defendant and his wife from then on. The witness Palmer saw him the next day, and the witness Paulson saw him leaving the premises on the early morning of the 22d, the day upon which the murder was committed. Nothing was seen or heard of either the defendant or his wife after the defendant was seen by the witness Paulson until about noon of the 24th, more than two days after the murder was committed. On that day Miss Anderson, the proprietress of the apartments, suspecting that something was wrong, or at least feel-

ing concerned at not seeing the parties who had rented the apartment, in company with Mr. and Mrs. Paulson, who occupied the apartment below, unlocked the door to defendant's apartment and entered the room. They were shocked and horrified at what they discovered. They found that defendant's wife had been murdered. They made no investigation in detail at that time, but immediately called the sheriff and other officers. Upon examination it was found by the officers that the deceased was lying on the bed, covered with bedclothing. A flatiron with a cloth wrapped around it was lying by her head, resting against it; her head was badly beaten; her face was crushed, nose broken, and the blood of the victim had spattered the walls of the room above her head and all over the pillow. There was also blood on the flatiron. The flatiron belonged to this apartment, and was kept in a little closet in the room. Two drawers of the dresser in the front room were open—the room otherwise did not appear to have been disturbed. There was some jewelry on the finger of the deceased, and some on the dresser above referred to. Various other articles and trinkets not necessary to describe were found by the officers. There was never any question in the minds of the officers or any one else acquainted with the situation but that the woman had been foully and brutally murdered while lying on her bed in the front room on this apartment, but who the murderer was now became the absorbing question. Everything possible seems to have been done to destroy every evidence of the identity of the parties. The face of the deceased had been beaten and crushed beyond all recognition. The room had been stripped of practically everything that could possibly throw light upon the identity of the persons who had rented the apartment or the person who had committed the murder. Suspicion naturally rested upon the defendant. He had disappeared; his whereabouts were unknown; no trace had been left behind. Every imaginary clew was followed, but, as there was no tangible clew to follow, all effort to run down the perpetrator of the deed was abortive, and the mystery surrounding the commission of the crime remained unsolved. On the 23d day of December, 1916, three months and

one day after the date upon which the murder was committed, the defendant, then being in the city of Chicago, communicated to the witness Larkin, chief of detectives of the police force of that city, the fact that he was the husband of the murdered woman, and, while protesting his innocence, assumed to communicate to the detective all that he knew respecting the crime. The officers of Salt Lake City and county were immediately notified, and at once proceeded to Chicago, and returned with the defendant, who voluntarily accompanied them back to Salt Lake. On their return they came by way of Denver, and there procured a suitcase of the defendant which had been shipped to that point from Salt Lake City on the morning when the murder was committed. Many admissions were made to the officers by the defendant as to the kind of life he had previously led. With it all, however, he protested from beginning to end that he was innocent of the murder of his wife.

As substantially all that is material in these admissions of the defendant is covered by and included in the document written by him, hereinafter known as Exhibit 39, the substance of which will be hereafter referred to in its proper place, we make no further statement at this time concerning these admissions. Exhibit 39 is a twenty-one page manuscript found in a safety deposit box in a Chicago bank after the defendant was brought to Salt Lake City. A safety deposit key was found in defendant's necktie, and after some reluctance he told the officers where the box could be found, and gave them authority to have the contents forwarded to Salt Lake City. Other manuscripts, in the form of letters the defendant had written to officers, were found in the box, but their materiality is of minor importance.

Some matters pertaining to the history of the principal parties to this tragedy, not heretofore detailed, are of sufficient importance to be stated in this connection. The defendant first met the woman, whom he afterwards married, and who was the victim of the tragedy, in New York City in 1914. She was then married to a Russian Jew named Fisher, who was engaged in keeping a rooming house and haberdashery com-

bined.   Defendant became acquainted with these people, and later on became their lodger in the rooming house referred to. Defendant and the woman fell in love, and in November, 1915, eloped and came West to Reno, Nev., accompanied by her son Max Fisher and his wife.   They arrived at Reno and took up their residence for the purpose of procuring for her a divorce. They brought with them jewels approximately to the value of $2,000.   These they mortgaged to a bank in Reno, and secured a loan of $750 with which they engaged in the rooming house business while acquiring residential qualifications. During this period defendant made frequent incursions into other sections of the country, sometimes remaining absent for several days.   On his return he usually had jewels to pawn or dispose of, and by this means it is estimated, by his own admission and testimony of his witness, that during the six or eight months he was in Reno he had accumulated in all $10,000 or $12,000 worth of jewelry.   At the end of six months after arriving in Reno Mrs. Fisher procured a divorce, and the next day she and the defendant were married.   The rooming house business was a losing venture and was abandoned.   They took a trip for two or three weeks to California, then returned to Reno, wound up their business, and shipped some trunks, with clothing and other articles, to New York to Max Fisher, who had returned to that city.   Defendant and his wife, ostensibly en route to the East, stopped over in Salt Lake City, as heretofore stated, September 20, 1916, and rented the apartment in which she was afterwards murdered.

The first assignment of error relied on by appellant is the refusal of the court to sustain his challenge of the juror Caldwell.   In answer to defendant's attorney, the juror, while being examined on his voir dire, stated in various forms substantially that, if the defendant could prove his innocence, it was his duty to do so.   He also stated in effect, that if he did not prove his innocence he (the juror) would bring in a verdict of guilty if the evidence was strong enough to prove it.   After this examination of the juror by the defendant's counsel, in answer to questions propounded by the court, the juror, in effect, stated he meant

that if the state proved defendant's guilt beyond a reasonable doubt the juror would then require the defendant to prove his innocence if he could; that if the court instructed him to acquit the defendant, unless his guilt was established beyond a reasonable doubt, he would follow such instructions in spite of the fact that the defendant could probably prove his innocence. The juror also stated that he would not require the defendant to prove his innocence until after the state had proved his guilt beyond a reasonable doubt. We think the juror was fair. When he was made to understand his duty in respect to the matter complained of, he frankly expressed his willingness to accord to the defendant the particular right for which his attorney so earnestly contended. That the juror qualified himself, by his answers, to try the case, and that the defendant was not prejudiced by the ruling of the court denying the challenge, are questions about which we have no doubt whatever. This assignment is without merit.

The next alleged error complained of by appellant relates to the examination of Henry Dinwoodey as to his qualifications to sit as a juror. Mr. Dinwoodey very frankly stated, in answer to questions propounded by the court, that he had formed an opinion as to the guilt or innocence of defendant; that he retained such opinion; that it was very strong and fixed. When asked if he, notwithstanding such opinion, could act impartially and fairly on the evidence admitted, the juror answered, "It would have to be pretty strong, and the man produced who really did it." Finally the court asked, "Just what is the nature of your prejudice; can you express it—explain it to the court?" The juror answered, "Well, I believe a burglar would do most anything." The juror, of course, was excused; but appellant complains that, because of the standing influence of Mr. Dinwoodey in the community, the answers forced by the court in the presence and hearing of the other jurors were exceedingly prejudicial to the defendant. There can be no doubt in the mind of this court that if the trial court had known, or could have surmised, that Mr. Dinwoodey would have answered the last question in the way he did, it would not have

propounded the question at all. The proposed juror, in the beginning of his examination by the court, had stated that he received his information about the case from common newspaper talk only. Ordinarily information from reading newspapers will not and does not disqualify the juror; and, as is well known, there is a tendency on the part of the active business man to avoid jury duty if possible, especially in cases likely to be tedious and of long duration. These considerations probably induced the court to pursue an examination more searching and rigorous that in otherwise would have done. Besides this, counsel for defendant were in charge of defendant's defense. If, in their opinion, the court was pressing this question to the danger point, and should conclude its examination, they should have raised the question then and there. They had ample time and opportunity. And, finally, when the last question was answered, if they feared the influence of Mr. Dinwoodey's statements on the minds of the other jurors, counsel might at least have requested the court then and there to instruct the jury to disregard it and close their minds against it. Unless we can have more confidence in jurors than to believe that they will be swayed by every wind that blows and by every expression of opinion uttered in their presence, and that, too, in violation of the solemn oaths they have taken, the vaunted palladium of our civil rights, as the right to a trial by jury has been called, would better be abolished.

Assuming, as we do, that the jurors selected were men of ordinary intelligence, with minds of their own, conscientious in respect to their duties as demonstrated by their answers during the course of their examination, it is quite clear to the mind of this court that they were not prejudiced by the proceedings complained of.

After twelve jurors had been qualified and were sworn to try the case, and after a substantial part of the state's evidence had been introduced, one of the jurors died, rendering it necessary to fill up the panel and begin the trial anew.

Comp. Laws of Utah, 1907, section 4873, provides as follows:

"If, before the conclusion of the trial, a juror becomes sick, so as to be unable to perform his duty, the court may order him to be discharged. In that case a new juror may be sworn and the trial begin anew, or the jury may be discharged and a new jury then or afterward impaneled."

It will be observed that this section of the Code provides two alternatives: (1) A new juror can be sworn and the trial begin anew; or (2) the entire jury may be discharged and a new jury impaneled. In the case at bar the prosecuting attorney and defendant's counsel stipulated that the court might adopt the first alternative. The new juror was therefore called and qualified to take the place of the deceased juror. The question raised by this assignment relates to the right of the defendant to exercise one or more additional peremptory challenges in view of the extraordinary situation caused by the death of the juror. The defendant had exhausted all his peremptory challenges when the extraordinary condition arose, but insisted that, as against the new juror, he had never had the opportunity of exercising the right, and therefore a challenge should be allowed. It was contended by defendant that the above section of our statute was adopted literally from the statute of California, and that the courts of that state, before we adopted the statute, had construed it as allowing additional challenges in such cases; that therefore the courts of this state are bound by that construction. As showing the construction placed upon the statute by the court of California appellant cites *People* v. *Stewart,* 64 Cal. 60, 28 Pac. 112; *People* v. *Brady,* 72 Cal. 490, 14 Pac. 202; *People* v. *Wong Ark,* 96 Cal. 125, 30 Pac. 1115; *People* v. *Zeiler,* 135 Cal. 462, 67 Pac. 754, 56 L. R. A. 882; and *People* v. *Weber,* 149 Cal. 325, 86 Pac. 671. These cases seem to favor the construction for which appellant contends. The first case cited by appellant apparently did not receive the serious consideration that its importance demands. The distinguished justice who wrote the opinion disposed of the question in space less than one column of the Pacific Reporter. He assumes that

a trial beginning anew means the impaneling of a new jury entirely, thus ignoring the incongruity which such a construction would give to the section when considered as a whole. It places the two alternative methods on the same plane, and gives to each the same scope and meaning; in other words, whichever alternative is adopted the court must discharge the entire jury and draw a new one from the box. That cannot be the meaning of the statute. The other cases cited by appellant adhere to the doctrine annunciated in the first case, but apparently with more or less misgivings as to the correctness of the doctrine. Finally, it is manifest, from the later decisions cited, that if it were now a question of the first impression that court would adopt a different construction.

A thoroughly well-considered case, arising under the same statute, likewise adopted from California, arose in North Dakota. *North Dakota* v. *Hazledahl,* 2 N. D. 521, 52 N. W. 315, 6 L. R. A. 150. While entertaining a more than ordinarily high regard for the opinions of the California court, as stated in the opinion of the North Dakota case just cited: "In this instance we are unable to follow where that court leads." The opinion in the North Dakota case is so consistent, sound, and well considered we are disposed to adopt the rule therein announced without further comment.

We recognize the rule of construction contended for by appellant, to a modified extent at least, that where a state adopts a statute of another state it is presumed that it likewise adopts the construction that has been placed upon it by the courts of that state prior to its adoption. That rule is recognized by this court in the modified sense of which we speak in *Dixon* v. *Ricketts,* 26 Utah, 215, at page 221, 72 Pac. 947. It will be seen, however, that this court, while recognizing it as a general rule, does not recognize it as absolutely binding. The rule does not go so far as to compel the adoption of a construction which in the judgment of the court is inconsistent, unreasonable, and unwarranted. Besides this, in the present case the rule has no force whatever as a rule of construction, inasmuch as all the cases relied on by appellant are subsequent to our adoption of the Cali-

fornia statute.  See marginal note to Comp. Laws Utah 1888, vol. 2, section 5056, in which the adoption of the statute in question here appears to have been made in 1878, five years previous to *People v. Stewart,* the earliest case cited by appellant.  Appellant was therefore mistaken as to the question of priority.

In conclusion upon this point there is yet to be stated another reason that is worthy of at least a passing consideration. The number of peremptory challenges to which a party is entitled is solely a matter of procedure; it is determined by the Legislature and fixed by statutory law, and even a defendant in a criminal case, while entitled absolutely to whatever number of peremptory challenges the statute gives him, acquires therein no vested right that would preclude the Legislature from increasing or diminishing the number at will. Being controlled absolutely by the Legislature, it follows that he is not entitled to any greater number of peremptory challenges than the statute provides.  The statutes of Utah in cases of this kind allow ten peremptory challenges.  They also provide, as we have seen, what may be done should a juror, after being sworn become sick and unable to serve, but no provision allowing extra challenges on account of such contingency can be found within the statutes.  How, then, can it be contended that the right exists?  The defendant in this case was in no worse condition, so far as his peremptory challenges were concerned, when the new juror was sworn on his voir dire, than he would have been if the juror had not died, and he had exhausted his challenges before the last juror was called into the box.  The court did not err in refusing defendant additional peremptory challenges.  See 24 Cyc. 355; 16 R. C. L. p. 244, section 61.

Numerous errors are assigned by appellant in relation to the admission in evidence of divers exhibits by the state, each of which tended to show admissions by the defendant of crimes committed by him other than the one for which he was being tried.  As Exhibit 39 is by far the most far-reaching and important, and includes practically every admission covered by the other exhibits, we feel we will be

doing no injustice by considering them altogether in the assignment relating to Exhibit 39.

This is the document referred to in the early pages of this opinion. As there stated, it was found in a safety deposit box in a Chicago bank, and forwarded to Salt Lake City with other manuscripts by authority of the defendant. The document consists of twenty one pages of manuscript writing. It is therefore too voluminous to publish in full; it would unduly lengthen this opinion, and, after all, serve no better purpose than would a brief synopsis.

Defendant assumes to write the document in order that those concerned may have first-hand information. He disclaims any pride in the exploits he is going to relate. He says he is a burglar from necessity, in order to obtain the money necessary to his style of living. He has been engaged in the business for twelve years; was captured once, which he admits was fortunate, because he was addicted to drugs and was placed where he could not obtain them. He served three years in prison, was paroled, and carried on the same business during his parole. States that the document is his last writing. He then proceeds to name the various places where he plied his profession—Westchester county, New York, where he was known as the "Phantom Burglar," New Rochelle, Port Chester, Pellham, Larchmont, Rye, and New Haven, Conn. That was in the fall of 1915, and his accumulations at that time amounted in value to the sum of at least $50,000. Other places are also named. He boasts of his success in his chosen profession. He speaks of meeting the lady who afterwards gave up her home and friends and started with him on the "nerve-racking seas of a burglar's life." He states, however, that she had no idea of his occupation. He tells of the elopement from New York in November, 1915; their residence in Reno in anticipation of a divorce for her, and his desire to "pull off one or two jobs," return to New York, and settle down. He then speaks of their trip to California, and his exploits in San Francisco and Oakland as the "step-ladder" burglar; of his making a laughing stock of their best and finest officers; speaks of the divorce, their marriage, his love

for his wife; his making $10,000 in Nevada and California; his desire for $5,000 more, and then, with professed heartache a resolution to tell the truth, he brings us back from California to Reno, in September, 1916, and thence on to Salt Lake City, where he knew there was a "good thing" and intended to "pull it off." Here he says, speaking of Salt Lake City.:

"Would to God we had passed that accursed place; would to God I had left her with her husband and relatives; I have laughed and mocked at the law; I have strutted and patted myself on the back! I have said 'Some Kid'; blind fool, to think that God would let me get away with it. In one sweep he punished me for a hundred lives such as mine."

Speaks of numerous other burglaries, including that of "Dennishawn," in Los Angeles, the home of Ruth St. Dennis. He tells of his wife's love of the glitter and flash of diamonds and warning her to be careful. Finally he comes to the renting of the apartment in Salt Lake City, and the fact that Ruth St. Dennis was performing at the Orpheum, and that he and his wife attended the Orpheum Theater on the night preceding her murder, she at the time wearing diamonds he had stolen from Ruth St. Dennis. His wife also wore a pair of ear screws and other jewelry. He had consented she might wear them on this particular occasion. To her wearing these he attributes their misfortune. As they left the theater that night he noticed two well-dressed men whose stamp he understood, but thought no more of it until he arrived at the apartment. From this point he thought he saw the same two men watching him and his wife. He requested his wife to leave her door unlocked, as he was going out, vaguely hinting, on his usual business. He desired to enter without disturbing her on his return. It was then one thirty the morning of the 22d. He kissed her good-bye, and went out "to try his hand for the last time." He did not succeed in his venture. He returned to the apartment, ascended quietly, and whispered, "Hello, Babes!" No answer. He does not describe what he saw. He was horrified; he approached her; she was cold. A great fear came over him; he would be accused; he could not explain his absence. He lifted her hands; the jewels were

gone.   He looked at all of the hiding places usual with them.
He found some, but the main part of his stolen loot was again
stolen, and with it the life of his wife.   He destroyed every
means of identification, went out, locked the door, and, as he
left, waved a parting wave towards the window.   This was
six thirty a. m.   He had fifty-five dollars in cash and by this
and various means reached the middle West.   Here he ex-
plains how much he loved his wife; denied that they had ever
quarreled except as true lovers quarrel; told of the finery he
had given her, shipped to New York, and of the jewels, etc.
His theory of the tragedy he now relates.   He pictured in his
imagination just how the tragedy occurred.   The two men he
had seen waited, saw him leave the apartment.   They silently
crept up stairs.   She, disrobed, was awaiting his return.   The
jewels flashed; out came the blackjack—one stroke—the body
quivered; a low moan, from the lips a half whisper, "Dear,"
and then the other man picked up a heavy flatiron, brought
it down with crashing force upon that loved face again and
again, until the dear form lay still.   Then stripping the fingers
and arms of all valuables, taking from under the pillow a
wallet containing $460, throwing over that horrible sight the
pillows and bedcovers, they fled.   Then comes cursings,
threatenings, and prophetic denunciations against the demons
who murdered his wife.   He then gives a list of the jewelry
that was stolen from his wife at the time she was murdered.
This consists, as represented, of numerous articles of jewelry,
including rings, bracelets, neck chains, snake bracelets, pins
and earrings, among which were what was called "Merry
Widow" earings, amounting in all to hundreds of stones,
principally diamonds.   The writer asserts that this list, with
one exception, was stolen from the apartment when his wife
was murdered.   The exception referred to was a scarf pin
which had been pawned by him, and therefore was not among
the stolen jewels.   The document was signed J. E. Warren,
which the writer admits is not his true name.

Such, in substance, is Exhibit 39.   It follows from what we
have said as to the length of the document itself that the
abstract we have furnished is only a brief synopsis; neverthe-

less we have endeavored to present sufficient of its contents to illustrate the grounds of the objection as well as such portions as are admittedly relevant and material. Defendant objected to its admissibility on the grounds that it was irrelevant, immaterial, and incompetent, the specific objection being that proof of the other crimes not tending to prove the crime for which he was being tried only tended to prejudice him in the minds of the jury. The document was admitted over defendant's objection whereupon the defendant moved that the jury then and there be instructed that in considering the document they should only consider it in reference to the crime for which the defendant was then being tried, and not in reference to the burglaries he admitted having committed. The court, in effect, so charged the jury, except that they were permitted to consider the burglaries solely upon the question of motive.

In speaking of the rule which, under exceptional circumstances, permits evidence of other crimes to be admitted on a trial of one charged with a specific crime, counsel for appellant in their admirable brief filed in this case clearly and succinctly enumerate many of the circumstances under which such evidence may be admitted. At page 26 of the brief they say:

"Generally speaking, evidence of other crimes is competent to prove the specific crime charged when it tends to show: (1) Motive; (2) intent; (3) the absence of mistake or accident; (4) a common scheme or plan embracing the commission of two or more crimes so relating to each other that the proof of one tends to establish the other: (5) the identity of the person charged with the commission of the crime on trial."

The court in this case admitted the exhibit in evidence solely on the question of motive. If however, it was permissible on other grounds, the state, of course, had the right to introduce it and have it considered by the jury. On the subject of motive on a trial for murder, Underhill on Criminal Evidence, at page 563, says:

"Motive, upon a trial for murder, need not be shown. The absence of motive does not alone require that the accused shall be acquitted there-

of. It may be considered in determining the presence of intention. Any evidence that tends to show that the defendant had a motive for killing the deceased is always relevant as rendering more probable the inference that he did kill him.''

The same author, speaking of the admission of evidence relating to other crimes, at page 163, same volume, says:

''All evidence is relevant which throws, or tends to throw, any light upon the guilt or innocence of the prisoner, and relevant evidence which is introduced to prove any material fact ought not to be rejected merely because it proves, or tends to prove, that at some other time, or at the same time, the accused has been guilty of some other separate, independent, and dissimilar crime.''

Wharton in his work on Criminal Evidence, vol. 1, p. 145, after speaking generally of the question of motive, says:

''But in those cases in which the evidence of the crime charged is for the most part or wholly of a circumstantial character, motive frequently becomes a powerful aid in identifying the accused, and thus connecting him with the commission of the crime. And where, on the trial of a criminal action, evidence is offered which is competent proof of the presence of motive in the mind of the accused, such evidence is not to be rejected because it also shows, or tends to show, a distinct and different crime.''

Again, on the same subject, at page 1167 (2d vol.), after speaking of the general rule which forbids testimony of other crimes when offered merely to show that the defendant would be likely to commit the crime with which he is charged, the same author says:

''But the evidence of other crimes is admissible to show motive, and, where relevant for this purpose, the admissibility is not affected by the fact that such evidence may prove other crimes.''

As bearing upon the same question, and sustaining the same doctrine, see 12 Cyc. 394, 406, and 418; also 8 R. C. L. 199; *Butt* v. *State*, 81 Ark. 173, 98 S. W. 723, 118 Am. St. Rep. 42; *People* v. *Ebanks*, 117 Cal. 652, 49 Pac. 1049, 40 L. R. A. 269; *State* v. *Jones*, 171 Mo. 401, 71 S. W. 680, 94 Am. St. Rep. 786; *People* v. *Rogers*, 192 N. Y. 331, 85 N. E. 135, 15 Ann. Cas. 177; *Commonwealth* v. *Majors*, 198 Pa. 290, 47 Atl. 741, 82 Am. St. Rep. 803; *People* v. *Higgins*, 127 Mich. 292, 86 N. W. 812. On the other hand, in support of his contention that

evidence of collateral and independent crimes is not admissible to prove the specific crime for which the defendant was on trial, appellant cites Wharton's Criminal Evidence (10th Ed.) sections 29, 30, 31, 32, 46, 47, 49, and 50; also *New York* v. *Molineux,* 168 N. Y. 264, 61 N. E. 286, 62 L. R. A. 193 and 357, and note; *New Hampshire* v. *Le Page,* 57 N. H. 245, 24 Am. Rep. 69; *People* v. *Sharp,* 107 N. Y. 427, 14 N. E. 319, 1 Am. Rep. 851; *State* v. *Anselmo,* 46 Utah, 137, 148 Pac. 1071. The authorities cited by both appellant and respondent show the general rule as to this class of evidence in which it is held to be inadmissible, and the exceptional circumstances under which it may be admitted. None of the authorities referred to dispute the proposition that proof of other crimes, whether similar or dissimilar, connected or unconnected, may be admitted to prove a motive for the specific crime for which the defendant is being tried.

In the case at bar the question is presented: In what way could the proof of other crimes committed by the defendant tend to prove that he murdered his wife? It must be presumed from the history we have of these parties, as detailed in the preceding pages of this opinion, in fact it is conceded, that his wife was cognizant to a greater or less extent of the kind of life he was leading, his criminal conduct, his partnership with crime, and more or less of the details pertaining to his crimes as enumerated in Exhibit 39, a synopsis of which we have heretofore set out. It also appears, a matter to which we have not heretofore referred, that in Reno, before coming to Utah, defendant and his wife quarreled, and bitter feelings of one towards the other were manifested to such an extent as to cause a witness who overheard them deep anxiety and concern. It also appears that two or three trunks containing clothing and other articles which had been brought from New York to Nevada were expressed back to New York addressed to Max Fisher, her son, thus indicating at least that the parties were going back to the scene of his first exploits, the city where she had formerly lived with her first husband. She, perhaps more than any other person living, as far at least as the record discloses, had it within her power to expose him and make

trouble for him in the event that she should turn against him, which, under the circumstances we have detailed, seemed highly probable. Here was a condition—a situation—of vital interest to the defendant and one from which a motive might be inferred. In order, however, to establish such motive, his criminal record, the crimes he had committed as admitted by himself, became material evidence in the case. Again, we refer to Wharton, at page 1689 (vol. 2), heretofore referred to, but not quoted, wherein the author says:

"Facts and circumstances are relevant, on a homicide charge, to show that the motive for the homicide was a concealment of a prior crime when they tend to prove that the accused was guilty of a prior crime, and knew that he was suspected by the deceased to be so guilty or that deceased was likely to discover the fact; or that there was an attempt to conceal stolen goods; or that the deceased had knowledge of the prior crime."

This question was involved to some extent in a recent case decided by this court. *State* v. *Inlow*, 44 Utah, 498, 141 Pac. 530, Ann. Cas. 1917A, 741. Inlow was convicted of the crime of murder. As motive for the crime the state proved that White, the victim of the murder, was a witness against Inlow in a case then pending, in which Inlow was charged with the crime of burglary. The defendant in that case conceded that, for the purpose of showing motive on the part of Inlow, the state had the right to show that he was charged with a certain offense and that the deceased would be a witness against him. It was not controverted in that case that the state had the right to introduce such evidence for the purpose of proving motive. For further authority on this question, see *Smith* v. *State*, 44 Tex. Cr. R. 53, 68 S. W. 267; *State* v. *Miller*, 156 Mo. 76, 56 S. W. 907; *Bess* v. *Commonwealth*, 116 Ky. 927, 77 S. W. 349; *People* v. *Harris*, 136 N. Y. 423, 33 N. E. 65; *Robinson* v. *State*, 114 Ga. 56, 39 S. E. 862.

It is not the province of this court, nor was it the province of the trial court, to determine whether the motive disclosed by Exhibit 39 was adequate or sufficient; that was a question solely for the jury. The question we have to decide is: Under the circumstances of this case, did the fact that        7

the defendant had committed other crimes, of which the deceased had knowledge, offer any motive whatever for the defendant taking her life? We admit the danger of permitting evidence of other crimes than the one specifically charged against the defendant, and that such evidence should be admitted with great caution and circumspection, for the tendency to prejudice a defendant in such cases is admittedly great; but when the evidence is relevant, as in this case, to prove motive, as we think we have shown, then it is admissible by all of the authorities with which we are familiar.

There are, however, other considerations connected with this question which apply with pecular force in this particular case. Counsel for appellant, in their examination of the jurors touching their qualifications to sit in the case, took particular pains to examine the jurors concerning their attitude in the event that it should appear in the evidence that the defendant had committed crimes other than the one for which he was on trial. Counsel elicited from each juror so examined the promise that he would not allow evidence of other crimes to influence his mind or prejudice him against the defendant. Not only was each juror so examined, but each juror heard the other jurors examined to the same effect, so that before the jurors were finally sworn to try the case they were not only prepared to expect evidence of the commission of other crimes by the defendant, but had been solemnly pledged to the proposition that they ought not to consider other crimes for the purpose of establishing the guilt of the defendant of the crime charged against him. Besides this, when Exhibit 39 was admitted in evidence, at the request of defendant's counsel, the court specially instructed the jury that evidence of other crimes should not be considered by them for the purpose of proving the offense charged, but that such evidence should be limited solely to the question of motive; and, finally, in the instructions at the close of the trial the court specifically instructed the jury as follows:

"You are instructed that the admission by the defendant of the commission of any other different crime from the one here charged in the information shall not be considered, nor have

you the right to consider such evidence for the purpose of punishing him for the crime here charged, nor must you talk about it in your jury room, but must wholly free your minds from any such thing, and not permit it to prejudice you or bias your judgment against the cause of the defendant.''

So that it appears in this case that, notwithstanding the evidence was admissible for the purpose of proving motive, nevertheless both the court and counsel for the defendant studiously adopted every precaution to prevent the evidence from being used for any other purpose.

Finally, it must be conceded that Exhibit 39 contained many statements and admissions in addition to the enumeration of defendant's crimes which were clearly relevant and material and not inadmissible from any point of view. The relation of defendant and deceased in New York;     9 their elopement; their relations in Nevada and California; their appearance in Salt Lake City and relations while there; their relations in the apartment; the defendant's conduct there, both before and after the murder—all of these matters of information as shown by the exhibit, and many others that might be mentioned, were clearly relevant, and not obnoxious to the specific objection raised by defendant. The defendant did not ask for a deletion or segregation, but objected to the document in its entirety. To have excluded the exhibit would have been to deprive the state of evidence to which it was entitled. The true rule in such cases is to admit the evidence and limit its application by proper instruction, which was done in this case. 12 Cyc. 631, and cases cited; *State* v. *Greene,* 33 Utah, 497, 94 Pac. 987; *Groot* v. *Railroad,* 34 Utah, 152, 96 Pac. 1019.

There was no error in admitting Exhibit 39 in evidence.

What has been said in disposing of that question likewise disposes of all the assignments of error relating to the admissions of other crimes in evidence whether in the form of exhibits or oral admissions sworn to by the witnesses.

Closely allied to the questions we have just reviewed is another presented by the assignment of errors, which we will now consider.

The district attorney, in the peroration of his closing argument to the jury, said:

"God Almighty, thousands of years ago, on Mount Sinai, declared what the law was, and we read in the Good Book that God said, 'Thou shalt not covet! Thou shalt not lie! Thou shalt not commit adultery! Thou shalt not kill!' Gentlemen of the jury, this man (pointing to defendant) has committed all these crimes. This self-confessed burglar has all his life laughed and scoffed at the law, at the officers of the law, and if you turn him loose he will laugh and scoff at you."

There was no exception taken to these remarks, no objection was raised then and there calling the court's attention to the fact that the remarks made by the district attorney were prejudicial, nor was there any objection made until several weeks after the close of the trial. It is a fundamental principle in practice that remarks of counsel in arguing a case to the jury, if deemed prejudicial, must be excepted to at the time, in order to give the court opportunity to correct, as far as possible, any prejudicial effect such remarks might have on the minds of the jurors. The authorities in support of this proposition are so numerous as to render it impracticable to do more than refer to reference books in which they are collated. Century Digest, vol. 14, section 1689, at page 2342; 12 Cyc. 584, in which it is said:

"Objections to improper remarks of the prosecuting attorney in his closing argument to the jury should be promptly made as soon as the improper remarks are uttered. Such objections come too late to be available to the accused if made after the counsel is through speaking, after the jury have rendered their verdict, or on motion for a new trial after a judgment of conviction."

This rule seems to be well-nigh universal. It cannot be successfully contended that the rule is technical or that it is hypercritical or unfair. While carefully attempting to safeguard every right of a defendant in a criminal case, the rights of the state must not be overlooked or disregarded. It would be manifestly unfair to the state and the people of the commonwealth to raise such an objection for the first time on a

motion for a new trial, and expect the judgment to be reversed and the case tried over again, when, if seasonable objection had been made, any possible prejudice might have been effectually cured. The court does not feel justified in refusing to enforce this salutary rule of practice, especially in view of the extra precautions taken by both the court and counsel for defendant, to which we have referred. In order to presume prejudice as resulting from the remarks of the district attorney, we would first have to conclude that the jurors were not only destitute of ordinary intelligence and common sense, but that they were likewise devoid of conscientious scruples, and disposed to recklessly disregard the obligations of the solemn oaths they had taken. We know of no case within the range of our experience where greater effort was made to disarm the jury of any and all prejudice respecting matters in evidence than was made by the court in the present case in respect to the subject-matter of this assignment. In view of these considerations, we do not feel justified in presuming that the defendant was prejudiced by the remarks of the district attorney in his closing address.

This disposes of all the assignments of error which we deem necessary to consider except the last, in which it is contended that the evidence is insufficient to sustain the verdict of the jury. In considering this question but little need be added to what has been said. It is difficult to see, in 12 view of the uncontroverted evidence in the case, how the jurors could have reached any other conclusion than the one they did. We have heretofore discussed the question of motive as reflecting upon the admissibility in evidence of other crimes admitted by the defendant. It was not in order at that time to refer to other motives which the defendant may have had for committing the crime charged against him. It is admitted by him, and proved by one of his witnesses, that he and his wife, while in Nevada and California, including jewels brought from New York, had accumulated in their possession jewels of the value of $10,000 or $12,000—a moderate fortune in itself for any person in the ordinary walks of life.

Cupidity is everywhere recognized as one of the most power-
ful incentives to human action. In addition to the motive
already considered for another purpose, sole and exclusive
possession of this little fortune may have become a con-
suming desire. It is no answer to say the defendant     13
might have robbed his wife without taking her life.
This would by no means have been a safe and easy task. To
rob her and then abandon her, in connection with other wrongs
disclosed by the record, would be to arouse in her all the pas-
sion of an angry woman turned into an implacable Nemesis,
pursuing him wherever he went, with all the ferocity of an
incurable resentment. To rob her, and then attempt to con-
tinue the peaceful relation of husband and wife, would have
proved equally futile. Knowing him as she did, he would
have been the first person she would have suspected. The
result in each case would have been the same; he would have
become a fugitive and a vagabond upon the earth as long as
the existence of both continued. Hence, to take her life, to
a man of his type, meant peace, security, and immunity from
punishment for his other crimes, and to take the jewels at
the same time meant wealth, comfort, and such happiness as
wealth and comfort affords. Neither will it do to contend,
as urged by appellant's counsel, that the defendant loved this
woman. In addition to the fact disclosed by the record to
the effect that they quarreled in Nevada and manifested ill
feelings towards one another, there is one feature of his own
admissions that forever precludes any idea of love on his part
for the murdered woman. Defendant says, in Exhibit 39,
that as they were leaving the Orpheum Theater on the night
preceding the murder he noticed two men whose stamp he
recognized because of his familiarity with such characters, and
these men were watching him and his wife. She at the time
was bedecked with jewels in more than ordinary profusion.
After leaving the theater and arriving at the apartment, just
as they were entering, he looked across and thought he again
saw these two men who had followed him and his wife to their
place of abode. In disregard of this apparently ominous cir-
cumstance, immediately after arriving at the apartment he

left his wife alone, unprotected, and, worse still, he requested her to leave the door of her room unlocked and the street door as well so that on his return he could enter without disturbing her or the other occupants of the house. Upon his return he found her murdered. Whatever else may be said, and whatever significance this circumstance may bear in the case, it not only conclusively shows that he did not love his wife, but that he had an utterly inhuman disregard for her personal safety. If, then, it can be assumed that he had no love for his wife, the motives heretofore referred to were amply sufficient to justify the presumption, in connection with other circumstances, that he himself committed the awful crime.

In enumerating the articles of jewelry stolen from his wife at the time of the murder, he mentions a particularly attractive pair of earrings known as "Merry Widow earrings," which she wore at the Orpheum Theater the evening preceding the murder. In Exhibit 39 he attributes to the wearing of these earrings the direful tragedy which afterwards occurred. To apply his own imaginary theory, the flashing of these precious stones in the glaring light of the theater excited the cupidity of the two men who were watching them. These men followed him and his wife and found out their lodging place, and after he left the apartment they entered, found her disrobed awaiting his return. One of them struck her with a blackjack—the body quivered; the other picked up the flatiron, raised it above her head, and brought it down time and again with crashing force upon her face until her form lay still. Then, stripping her of her jewelry and taking $460 in money, hastily throwing over the horrible sight the pillows and bedcoverings, they fled. This is the defendant's theory of the murder, stated substantially in his own language. He gave a list of all the jewelry taken from her by these murderers, which included the "Merry Widow earrings" above referred to. And yet the mountings of these earrings, with the precious stones extracted therefrom, were afterwards found by the vigilance of the officers of the state in a safety deposit box in a St. Louis bank. This box was rented and controlled by the defendant. The mountings were identified by a jeweler

of New York who made them for the murdered woman while she was the wife of her former husband. The defendant told one of the officers that the man that stole these earrings was the man who murdered his wife. Ominous words, and of deep significance, in the light of their discovery afterwards in defendant's possession.

Again, in this connection it is pertinent to state that defendant related a story to the officers to the effect that, on the night of the Orpheum Theater which he and his wife attended, she wore several thousand dollars' worth of diamonds; that among these was one particular piece which was in possession of another party in St. Louis about a week after defendant arrived there. This party displayed this particular piece of jewelry in a saloon in St. Louis, and that led to a tragedy. After this tragedy defendant claimed to have recovered all of the jewels taken when his wife was murdered. He stated that the man who murdered his wife was dead.

In another connection, one of the officers who had been to St. Louis investigating the case, on his return, asked the defendant if he had recovered a pair of earrings at the apartment house after the murder. Defendant stated he had not. He then asked defendant where was the body of the man that killed his wife. Defendant (in reply) asked the officers if he, while there, had heard of a mystery murder of the underworld. The officer answered, "No;" that he had gone into that particular question, and the only mystery murder he had heard of was that of a policeman. The officer again asked defendant where was the man buried. The defendant made no reply.

This weird, unbelievable story was undoubtedly a fabrication pure and simple—fabricated for the sole purpose of accounting for the "Merry Widow earrings" which were found in his safety deposit box in the St. Louis bank.

The defendant and his wife were total strangers in Salt Lake City. The witnesses Anderson, Paulson, and Palmer were the only persons of whom we have knowledge that even saw them while they occupied the apartment, and their knowledge did not amount to even the slightest acquaintance. The conditions for the perpetration of just such a deed as this, if

one had the motive and was so inclined, were exceedingly opportune. These, together with the obliteration or the removal of every mark of identity as to the woman murdered or the person who murdered her, made a case that would have baffled every attempt as solution had it not been that the defendant himself, as often happens in such cases, gave himself up to the officers of the law with what he believed to be a well-planned theory of defense. He alone had reasons for destroying every mark of identity pertaining to the murdered woman. A stranger entering that apartment, with whatever criminal design, could have had no motive for mutilating and disfiguring her face so as to destroy her identity. As suggested by the Attorney General in his masterful résumé of the facts, a stranger would only have been interested in hastily accomplishing his purpose and escaping without delay. To him what would it matter whether the unfortunate woman was Fanny De Weese or some one else? Not so with the defendant. His bringing her to that apartment, his previous relationship, his having been seen by at least three persons who knew of his relationship to the woman, his having to leave the apartment under circumstances that rendered it probable he might be seen leaving, his destroying every other possible means of identification, as admitted in Exhibit 39, and then leaving the apartment, locking the door, and fleeing from the state, combined with the other circumstances heretofore enumerated, point with unerring certainty to the defendant as the murderer of his wife. After the deed was committed the record discloses he contemplated suicide, attempted to accomplish it, and failed. The question is asked, why did he give himself up if he knew he was guilty? The problem is psychological. The writer confesses his inability to solve it. Similar conduct has happened before in the annals of crime, and probably will continue to happen in the future, as long as the enlightened consciences of men respond to the overpowering consciousness of guilt.

The defendant had a fair trial. He was defended by able counsel, who were fearless in the discharge of their professional duty. The conviction of the defendant is not attributable

to any act or omission of his counsel. The indubitable facts alone are responsible. We find no error in the record. The judgment is affirmed and the cause remanded, with directions to the trial court to fix the date for execution.

FRICK, C. J., and McCARTY, CORFMAN, and GIDEON, JJ., concur.