## PEOPLE *v.* HIGGINS.

1. CRIMINAL LAW—HOMICIDE—EVIDENCE.
   Evidence reviewed, and *held* sufficient, though circumstantial, to justify respondent's conviction of murder.

2. SAME—CONDUCT ON ARREST.
   Evidence of respondent's conduct on being arrested for burglary is admissible on his trial for murder, where he did not know on what charge he was being apprehended.

3. SAME—MANUSCRIPT STORY OF CRIME.
   A story in the handwriting of respondent, found among his effects several months after the commission of a murder for which he is on trial, and claimed to bear a close resemblance to the true narrative of the murder, is admissible in evidence as a circumstance in the case, though claimed by respondent to have been written prior to the murder.

4. SAME—POSSESSION OF WEAPON.
   The fact that respondent owned and carried a revolver of the same caliber as that with which a murder was committed may be shown on his trial therefor.

5. SAME—FAILURE TO CALL WITNESS.

A·conviction of murder will not be reversed because of the failure of the prosecution to call as a witness one of the physicians who participated in the autopsy, and who took the bullet from deceased's body, where all of the facts and circumstances were shown by the other witnesses present, and the omission was only brought to the attention of the court by a request for an acquittal.

6. SAME—CROSS-EXAMINATION.

The extent to which the cross-examination of a witness in a criminal case may be carried is largely within the discretion of the trial court.

7. SAME—CREDIBILITY OF RESPONDENT.

It may be shown on the cross-examination of respondent in a murder case, as going to his credibility, that he had been convicted of many atrocious crimes, and on his trials therefor had denied his guilt.

8. SAME—REMARKS OF PROSECUTING ATTORNEY.

A statement by the prosecuting attorney, in reply to a remark by respondent, "We ascertained that what you said to us was not true," which was at once condemned by the court, whereupon the prosecutor attempted to prove the truth of his statement by respondent, is not ground for reversal.

Error to Lenawee; Chester, J. Submitted February 15, 1901. Decided July 2, 1901.

John M. Higgins was convicted of murder in the first degree, and sentenced to imprisonment for life in the State prison at Jackson. Affirmed.

*Westerman & Westerman,* for appellant.

*J. N. Sampson,* Prosecuting Attorney (*John E. Bird,* of counsel), for the people.

HOOKER, J. On the night of April 16, 1897, a Dr. Ladd, of Adrian, was shot and killed by a burglar, who was detected by him in his residence. The respondent was convicted of murder in the first degree, and the cause is before us on error.

An outline of the testimony tending to show his guilt is as follows: Col. Avery, the supervisor of the First ward

of the city in which the Ladd residence was situated, saw. him near the residence, when he went, on April 16th, to take Ladd's assessment. Jennie King identified him as one who visited her at her home in Adrian the afternoon before the homicide. She stated that he left there towards evening. Edward O'Hearn, an old prison acquaintance, saw. him soon after, and walked with him to the corners near Ladd's house, about 7 p. m., which was about dusk. He states that they were personal friends, and he asked him what he was there for, and he said "for business." He stated that he had spent the afternoon in a sporting house. They had some talk about Emma Lesh's place, and started along. When opposite the Ladd place, he asked who lived there, and whether he was rich or poor. O'Hearn gave him directions to Emma Lesh's place, and he remarked that he would go down there, and see what he could do, and that, if he could not make a raise down there, the other place would be an easy mark. Witness supposed he referred to Dr. Ladd's place. During the walk he showed the witness a sectional jimmy. The window at Ladd's was entered by means of a jimmy. Mrs. English, a resident of Adrian, saw O'Hearn talking with a stranger near the Ladd residence at the time stated. Bessie De Witt, an inmate of Emma Lesh's place, testified that he came there between 7 and 8 p. m. of the night Ladd was killed, and stayed until near 2 o'clock in the morning. He was assigned a room in the house. He had some talk with her about robbing Emma Lesh. About 2 o'clock witness heard him going towards Mrs. Lesh's room, and got up. She made a noise, and he ran out of the house. Ladd was killed in the early morning before daylight.

The theory of the prosecution was that, after shooting Ladd, he went south to the cemetery, and through it to a highway called the "Treat Road," thence *via* that road to the Ohio line, and from there directly south to Delta, Ohio, where he took the Air Line Railroad train to the city of Toledo. George A. Williams saw him on the

Treat road, about six miles from Adrian, between 5 and 6 in the morning of April 17th, hurrying south, and looking back "all the while." He asked the distance and way to Delta, Ohio. Several farmers along the road saw him, and identified him by peculiar clothing which he wore. O'Hearn testified that, a week or 10 days after he saw him at Adrian, he received a letter from him to meet him at Air Line Junction, and that he rode down there on a night train, back of the engine. When he met him, respondent asked him what was said about the Ladd affair at Adrian. The witness told him that nothing was said concerning him, and he replied that, "if they ever find out who did that job, or croaked that old duck, it would be me that would tell them." He also talked about his being at Emma Lesh's that evening, and that he had a hard time going across the country to the Ohio town, and that he had a hard time making Toledo. Respondent told witness to let him know if he heard anything, and gave him a five-dollar bill to pay his expenses. He told him to address him "Dr. John Higgins, Toledo, Ohio, General Delivery," and said "he could fix an alibi—prove an alibi—in Toledo." A 32-caliber revolver was found on respondent's person when he was arrested, and a ball of that size was taken from the body of Dr. Ladd. The defendant was arrested at Toledo for another offense, and this arrest led to the suspicion that respondent was the man who shot Dr. Ladd.

The defendant's counsel claim that the testimony was insufficient to justify the submission of the case to the jury, and that the court should have directed an acquittal. We are of the opinion that the evidence, though circumstantial, was sufficient to support a verdict of guilty.

A witness named O'Brien testified that he was a detective in the employ of the city of Toledo, and, in company with one Carew, went to the house where respondent lived, for a man of a given description, who was suspected of a burglary of silverware in Toledo. As they approached the respondent, who stood on the porch bareheaded, they

recognized him as the man they wanted. When he saw
them, he went into the house. Witness went around the
house, and saw respondent escaping from the back door.
He climbed a fence, and was captured in a field, with a
revolver on his person. In answer to inquiries made, he
said he had disposed of the silverware in Adrian. This
led the officers to suspect his connection with the Ladd
affair, and the prosecuting attorney and sheriff of Lenawee
county were sent for, and came to Toledo. In the inter-
view that followed, he admitted that he knew Jennie King.
During this interview he called Carew out for a private
talk, and said he did not dispose of the silver in Adrian,
but had sent it to his sister, in Jackson, and signed a letter
to her to return it. The officers secured the box, and
found some silver in it, together with a story in manu-
script, in the writing of respondent, entitled "A Life for a
Life." This story is claimed to bear a close resemblance
to the true narrative of the Ladd murder, and it was ad-
mitted in evidence as a circumstance in the case.

Numerous objections attended the introduction of this
evidence. It was contended that, as the arrest had no
connection with this offense, and the defendant did not
know what he was arrested for, his conduct on that occa-
sion was not admissible, and that it was not permissible to
show that he had committed other offenses, and that the
story was not so connected with the Ladd matter—
especially as respondent testified that it was written before
that occurrence—as to be admissible. We think that the
learned circuit judge was commendably careful in receiv-
ing this testimony. The conduct of the defendant may or
may not have been due to his fears of arrest for the Ladd
matter, and the story may or may not show his knowledge
of that affair. These are questions to be determined by
the jury; but the circumstances were such as to make such
inferences legitimate. Again, the fact that he owned and
carried a 32-caliber revolver was pertinent. The testi-
mony was none the less admissible because it necessarily
involved a charge and arrest for other crimes. We think

the court did not err in admitting the testimony of O'Brien, or in receiving the manuscript.

An autopsy was held upon the body of Ladd, at which several surgeons were present. Error is assigned upon the failure to call a Dr. Williams, who participated in the operation. Counsel say he took the bullet from the body. The evidence of several of the physicians was taken as to what occurred. This seems to leave no room for doubt that Drs. Jewett and Williams operated, and that Williams found and produced the ball, which was examined by all, marked, and given to the witness who produced it, for safe-keeping. The question was raised in a request for acquittal upon this ground, and we are not advised by the brief that counsel for respondent asked that such witness be produced for examination. The danger of injury to the defendant by the omission to call Dr. Williams is not apparent to us, nor does it seem to have been to the defendant's counsel. If it was their right to have him called, it was their duty to ask that he be called seasonably, instead of omitting such request altogether, and seeking to take advantage of the omission by a request for an acquittal.

Exception was taken to the rigor of the cross-examination of Mary Wilcox and the defendant. These are matters largely within the discretion of the circuit judge, and, in view of the testimony elicited, we think that the propriety of such examination was vindicated. We think the discretion of the circuit judge was not abused. The testimony of Mary Wilcox, a married woman, justified a searching examination into her relations with the defendant. The defendant was a witness, and it was proper to show by him not only that he had been convicted of many atrocious crimes, but that on his former trials he had denied his guilt. These things went to the question of his credibility.

The statement of the prosecutor to the defendant in a colloquy, "We ascertained that what you said to us was not true," was a natural, if not proper, reply to a

remark by the respondent.   It was at once condemned by the court, whereupon the prosecutor attempted to prove the truth of his statement by the defendant himself.   We think this statement does not require a reversal of the case, and the same may be said of the examination of the witness Deveaux.

There are other assignments of error, but none which require discussion.

The judgment is affirmed.

The other Justices concurred.