PEOPLE *v.* HARRY FLEISH.

SAME *v.* APOSTEOPOLOS.

SAME *v.* SELIK.

SAME *v.* SAMUEL FLEISH.

1. CRIMINAL LAW—HOMICIDE—CONTINUANCE.

In prosecution of four defendants for common-law conspiracy to murder a State senator, where defendants were arraigned some four months after the murder and motion for continuance was filed about two months later, its denial did not constitute abuse of discretion, where nothing specific is shown to have been available which might have led to a different result.

REFERENCES FOR POINTS IN HEADNOTES

[2] 53 Am. Jur., Trial, §§ 459, 503, 506.

[2, 3] Reversal of conviction because of unfair or irrelevant argument or statements of fact by prosecuting attorney. 46 L.R.A. 641.

[3] 26 Am. Jur., Homicide, § 492.

[4, 11, 14] 3 Am. Jur., Appeal and Error, § 1041.

[5] 3 Am. Jur., Appeal and Error, § 1059.

[7] 27 Am. Jur., Indictments and Informations, § 43.

[8] 26 Am. Jur., Homicide, § 311.

[9] 20 Am. Jur., Evidence, §§ 270, 271; 26 Am. Jur., Homicide, § 312.

[10] 20 Am. Jur., Evidence, § 273; 26 Am. Jur., Homicide, § 312.

[12] 26 Am. Jur., Homicide, § 353.

[12–14] 26 Am. Jur., Homicide, § 351.

[12–14] Admissibility of evidence of other offenses in criminal prosecution to prove identity of defendant. 3 A.L.R. 1540; 22 A.L.R. 1016; 27 A.L.R. 357; 63 A.L.R. 602.

[15] 26 Am. Jur., Homicide, §§ 341, 342.

[16–19] 58 Am. Jur., Witnesses, §§ 609, 621, 624, 647, 664.

2. SAME—REMARKS OF PROSECUTOR—PUBLISHED ACCUSATIONS OF ATTORNEY GENERAL—INSTRUCTIONS.

In prosecution of four defendants for common-law conspiracy to murder a State senator, prosecutor's alleged belittling references to counsel for defendants and his alleged improper statements made in the course of trial which concluded some 16 days after it began, together with publication of accusations by the attorney general *held*, not reversible error, where court struck objectionable matter from record and charged jury to disregard it when objection was made.

3. SAME—ARGUMENT TO JURY—PREJUDICE.

Prosecutor's statement in argument to jury that $15,000 had been put up by certain politicians to quiet State senator who had testified at grand-jury investigation of legislature and with common-law conspiracy to murder whom defendants were charged, *held*, not to have prejudicially affected defendants in view of testimony in the case.

4. SAME—CONSPIRACY—ADMISSIONS—EVIDENCE.

Where testimony of woman at trial of defendants on charge of common-law conspiracy to murder was ordered stricken insofar as it pertained to statements made by one of the defendants or by her in his presence, and which were claimed to have amounted to admissions of guilt, defendants' rights were not prejudiced.

5. SAME—TRIAL—PUBLICATIONS PERTAINING TO CRIMINAL RECORD OF DEFENDANTS—PREJUDICE.

Publication of attorney general's report of his investigation of prison in which three of the four defendants charged with common-law conspiracy to murder a State senator together with a principal witness for the people were referred to as having criminal records *held*, not to have prejudiced defendants, where it is not shown accounts of such reports were communicated to jury, hence defendants were not denied a fair trial by an impartial jury.

6. CONSPIRACY—COMMON LAW—MURDER.

The crime of common-law conspiracy to commit murder is not a crime of violence.

7. SAME—RES GESTAE WITNESSES—INDORSEMENT ON INFORMATION.

Claim of error for failure of prosecution to indorse on information the names of persons who were merely present in a barroom at time principal witnesses claimed common-law conspiracy to commit murder was being promoted or persons who made a communication to one of the defendants that

was otherwise proved *held,* without merit, since such persons were not *res gestae* witnesses which the prosecution was obligated to produce in court in such a case, no application was made to the trial court to have their names indorsed and the persons produced, and no error appears to have been committed by the prosecution in calling as witnesses persons whose names were not indorsed or in failing to call persons whose names were indorsed.

8. SAME—EVIDENCE—DISCRETION OF COURT—PREJUDICE.

In conspiracy cases a precise rule as to competency and relevancy of evidence may not be formulated, admission of such evidence being, within reasonable bounds, in the discretion of the trial court and not ground for reversal in the absence of a showing of prejudice.

9. SAME—CIRCUMSTANTIAL EVIDENCE.

In a conspiracy case the jurors should have before them and are entitled to consider every fact which has a bearing on, and a tendency to prove, the ultimate fact in issue, hence great latitude must be allowed in the reception of circumstantial evidence and many facts of no consequence in isolation may be proved because of the persuasiveness of their united effect.

10. SAME—MOTIVE FOR MURDER—EVIDENCE.

In prosecution for common-law conspiracy to murder a State senator, reception in evidence of testimony connecting the conspiracy with a grand-jury investigation in another county was proper where testimony showed the motive for the murder was to prevent the victim from testifying in the other county at an examination of persons for whom warrants had been issued as a result of the grand-jury investigation.

11. SAME—MURDER—GUNS—EVIDENCE—PREJUDICE.

In prosecution for common-law conspiracy to murder where much of the testimony relating to guns was ordered stricken and defendants were shown, by competent testimony to have possessed or had access to guns, testimony relating to guns which was irrelevant but not stricken, *held,* not prejudicial to any appreciable degree.

12. SAME—PREVIOUS COMMITMENT OF NONTESTIFYING DEFENDANT TO PENAL INSTITUTION—EVIDENCE.

It was not error to receive testimony that certain nontestifying defendants in prosecution for common-law conspiracy

to murder had previously been committed to penal institutions where it was elicited from the people's witnesses incident to showing their relationship with such defendant, since it was competent and material to a full and fair presentation of the people's case.

13. CRIMINAL LAW—NONTESTIFYING DEFENDANT—PREVIOUS COMMITMENT TO PENAL INSTITUTION.

Generally, where a defendant does not testify in his own behalf, evidence of former convictions or offenses is not admissible except in cases wherein such evidence is material and relevant to the issue being tried.

14. CONSPIRACY—NONTESTIFYING DEFENDANT—PREVIOUS COMMITMENT TO PENAL INSTITUTION.

In prosecution for common-law conspiracy to murder, reversible error did not result from the testimony of one of the people's witnesses that in the vicinity of the murder one of the defendants had told of his experience at a Federal prison, where prosecution was seeking to show such defendant, who did not take the witness stand, had no legitimate purpose for being in such vicinity, prosecutor stated he had no intention of bringing out anything about such prison, and trial judge struck such answer and emphatically stated to jury it was to disregard matters stricken.

15. SAME—HOSTILE WITNESS—RELATIONS WITH DEFENDANT—EVIDENCE.

In prosecution for common-law conspiracy to murder; reception of testimony showing that relation between one of the defendants, a married man, and young woman was such that he paid rent for her apartment and frequented it and that she left more desirable occupations in order to be near him *held,* not prejudicial error, where taken for the purpose of showing the young woman was a hostile witness.

16. WITNESSES—CROSS-EXAMINATION.

Claim of error in undue restriction of defendants to charge of common-law conspiracy to murder in their right of cross-examination *held,* without merit.

17. SAME—COLLATERAL MATTERS—CROSS-EXAMINATION—DISCRETION OF COURT.

The discretion of the trial judge controls the nature and extent of the introduction of collateral matters upon cross-examination and will never be reviewed except in cases of abuse and this will not be lightly inferred.

**18.** SAME—ABUSE OF DISCRETION.

The discretion of the trial court upon the subject of cross-examination on collateral matters is not subject to review unless it is shown to have been grossly and oppressively abused.

**19.** SAME—MATTER OF RIGHT—DISCRETION OF COURT.

So far as cross-examination of a witness relates either to facts at issue or relevant facts, it is a matter of right; but when its object is to ascertain the accuracy or credibility of a witness, its method and duration are subject to the discretion of the court, and, unless abused, its exercise is not the subject of review.

**20.** CONSPIRACY—MURDER—SUFFICIENCY OF EVIDENCE.

In prosecution of four defendants on charge of common-law conspiracy to murder, testimony showing that one of them was at a beer parlor for about an hour a few miles distant from the scene of the murder and that he was on friendly relations with one of the other defendants but not otherwise implicating him with the crime *held,* insufficient for basing verdict of guilt as to such defendant.

Appeal from Calhoun; Hatch (Blaine W.), J. Submitted April 15, 1948. (Docket No. 69, Calendar No. 43,436.) Decided June 14, 1948. Rehearing denied defendants Fleish and Selik September 8, 1948.

Harry Fleish, alias Harry Fleisher, alias Harry Fisher, Peter Aposteopolos, alias Pete Apostolapos, alias Pete Mahoney, Myron Selik and Samuel Fleish, alias Sammy Fleisher were convicted of conspiracy to kill and murder. Reversed without new trial as to Peter Aposteopolos, alias Pete Apostolapos, alias Pete Mahoney. Affirmed as to other defendants.

*Edward H. Kennedy,* for defendants Harry Fleish, Aposteopolos, and Selik.

*R. G. Leitch,* for defendant Samuel Fleish.

*Eugene F. Black,* Attorney General, *Edmund E. Shepherd,* Solicitor General, *H. H. Warner, Victor*

*C. Anderson* and *Daniel J. O'Hara,* Assistants Attorney General, and *Richard B. Foster,* Special Assistant Prosecuting Attorney, for the people.

NORTH, J.  On trial by jury the defendants herein were convicted of the charge of common-law conspiracy to kill and murder one Warren G. Hooper. Each was sentenced to a prison term.  Leave having been granted, the defendants have appealed, and in support thereof have asserted a multiplicity of alleged errors.  The return on the examination before the magistrate was filed May 16, 1945, and on the following day the information was filed and defendants arraigned.  Defendant Samuel (Sammy) Fleisher stood mute and the other three pleaded not guilty.  All of the defendants were released on bail on or before May 29, 1945.  At the time the information was filed the names of 13 witnesses were indorsed thereon, and on June 18th the names of 10 additional witnesses were added on motion of the prosecution over the objection of defendants.  The case was set for trial on July 16, 1945.  Defendants' motion for a continuance filed July 13th was denied July 16th, and the trial of the case commenced.  The trial continued from day to day until July 31, 1945, excluding four days over week ends, at which time a verdict of guilty was rendered against each of the four defendants.  Their motion for a new trial was denied.

As above noted the alleged conspiracy was to murder Warren G. Hooper, who was a State senator. There was pending in Ingham county an investigation by a so-called one-man grand jury as to there having been graft or bribery incident to conduct of certain members of the State legislature and others. Senator Hooper had appeared as a witness before the grand jury on September 8, 1944, October 20, 1944, and on at least three occasions in November,

1944. On December 2, 1944, a warrant was issued charging that Frank McKay, Floyd Fitzsimmons, William Green, and certain other persons, conspired among themselves and with others to corruptly influence the action of certain members of the State legislature relative to pending legislation. It was assumed, and seemed very probable, that Senator Hooper would be an important witness for the people at the examination and in the prosecution of that case. It is out of this circumstance that there arose the people's theory that a conspiracy to which the defendants were parties was entered into to prevent Senator Hooper from being a witness in behalf of the people by causing him to be murdered.

In February, 1945, one Alfred Kurner, who at the time was confined in the Wayne county jail awaiting trial for robbery armed, communicated by letter to the one-man grand jury that he, Kurner, possessed some information concerning the circumstances surrounding the death of Senator Hooper. Kurner, having been granted immunity, gave testimony before the grand jury which seemingly involved one Sammy Abramowitz in connection with the charge in the instant case. Thereupon Abramowitz was taken into custody and after being detained for some 25 days and upon being granted immunity, gave testimony which in turn implicated one Henry Luks, who was thereupon taken into custody. Luks, having been granted immunity, gave testimony before the grand jury which implicated the defendants in the instant case and their arrest, trial and conviction followed.

In a large measure the alleged errors of which appellants complain have to do with claimed violations of their rights under the due process guaranteed by the United States Constitution and their rights guaranteed under State law. At the outset they complain that by the denial on July 16th of

their motion for continuance to the next September term of court they were refused opportunity to properly prepare their defense. Under the record before us we find no merit to this contention. As above noted, the return of the examination before the magistrate was filed May 16, 1945, and the arraignment of defendants occurred on the following day. The trial did not commence until July 16th, two months after defendants' arraignment. We are mindful that in the meantime three of defendants were taken into custody in another county where they were charged with having committed another wholly disassociated crime and substantial bail was required incident to their release from custody. Practically a month after conclusion of the trial in the instant case defendants filed their motion for a new trial, but we do not find in that motion defendants pointed out with any degree of particularity or definiteness wherein they were prejudiced by denial of their motion for a continuance. The record justifies the trial court's statement incident to denying defendants' motion for a continuance. He therein said:

"The only reason you are asking for a continuance is that you cannot prepare. I realize that these defendants have been in different places in jail. * * * There is no reason why all the burden (of preparing for trial) should have been put on Mr. Leitch and Mr. Rodgers. They (defendants) have other attorneys in here. One of them just came in today, but they could have had them before. There has been plenty of time for them to make proper investigation to try this case. I don't think the court is abusing his discretion one bit by denying the motion. They had every opportunity. We have gone to some expense in the county, calling extra jurors. We have one witness detained, that the county is put to expense on. It seems to me that putting it over further would not assist the defendants in their defense. This case is not more difficult than a lot of others, it

is an ordinary conspiracy case. I can't see why you haven't had, in two months, time to get in touch with witnesses and be prepared."

Even as late as the filing of a reply brief after the hearing in this Court, counsel still fail to point out specifically anything further which they might have done in behalf of defendants, and which probably would have led to a different result, had their motion to continue been granted. Instead, the following is a fair example of the indefinite character of this phase of defendants' claim, taken from their reply brief in this Court: "Time to really prepare for trial *might well have enabled* defense counsel to prove the real interest of prosecution witnesses in this matter, as well as the falsity of their testimony." As above indicated, we fail to find sufficient merit in this claim of defendants to justify a holding that the trial judge abused his discretionary power in denying defendants' motion for a continuance.

Defendants assert that they were denied their right to a fair trial because of (1) the prosecutor's belittling references to counsel for defendants, (2) improper statements by the prosecutor, (3) publication of accusations by the attorney general, and (4) failure to call *res gestae* witnesses.

Items (1), (2), and (3) of the above are quite in the same category and it was to this phase of the case that oral arguments of defendants' counsel in this Court were most strenuously directed. As to the alleged belittling references and improper statements of the special prosecutor during the course of the trial, the record in the instant case cannot be said to be of a materially different character than that in the cases about to be cited and wherein we held there was no resulting prejudicial error. See *People* v. *Burnstein,* 261 Mich. 534; *People* v. *De-Lano,* 318 Mich. 557 (certiorari denied by United States supreme court); *People* v. *Logie, ante,* 303.

At the 12-day trial of the instant case there was abundance of able counsel on each side. The trial was hotly contested, and from time to time irritating situations developed. Many frivolous objections and interruptions were interposed, rather caustic remarks and accusations came from both sides. It would serve no purpose to recite them here in detail. But it may be noted as bearing upon any adverse effect upon the jury that defendants' complaints of this character, while marshalled together in presenting this appeal, did not so occur at the trial, but instead they occurred at separate intervals during the trial which commenced July 16th and concluded 16 days later. Further, in a very large proportion of the instances when such matters as are now under consideration arose, the trial judge in response to motions of defendants' counsel struck from the record the objectionable matter and charged the jury to totally disregard it. In many instances now complained of no objection was made by defendants' counsel, and repeatedly in this long trial the circuit judge directed counsel for the respective parties to cease arguing among themselves and to proceed with the trial of the case. In the respects just noted we find no sufficient ground for reversal.

This section of appellants' brief also presents their contention that in his argument to the jury the special prosecutor made prejudicial statements. We quote from the first of these as presented in appellants' brief:

"During his final argument, the prosecutor made this statement: 'There is no question that the people have not yet found the connecting link between the person who gave the money and the person who gave it to Harry Fleisher.' Mr. Kennedy objected to that statement saying: 'It is wholly prejudicial. There is not one iota of evidence in this case that any person paid any money to Harry Fleisher.' * * * It

was highly prejudicial not only to Harry Fleisher, but to all of the defendants."

Apparently in reply to the above objection the prosecutor stated:

" 'That is ridiculous. Evidence in this case is replete with the fact that all of these men, not once but a number of times, said there was $15,000 up by certain politicians; that certain politicians wanted to quiet this man because he talked.' "

In their brief appellants assert "there was no testimony that either Mahoney or Sam Fleisher had ever mentioned $15,000, being up by politicians or by anyone else. The court did nothing to clear up the false statement about Harry Fleisher receiving money, and with respect to the statement about all the men, the court commented: 'That is in the record.' " While the prosecutor's statement in a rather minor respect might not have been fully accurate, we do not think it prejudicially affected the outcome of this case as to any the defendants. As before stated there was in the background of this prosecution claimed irregularity in the conduct of certain members of the State legislature; and in any event if money had been placed in someone's hands for the purpose of accomplishing the object of the conspiracy charged, it was of no material consequence as to whether such money was provided by politicians or some other persons. In numerous places the record contains evidence that $15,000 had been made available for payment to those who carried out the object of the alleged conspiracy; and there is room for fairly drawing the inference that such money, if not paid to Harry Fleisher, was at least available to him. The testimony of Abramowitz disclosed that on repeated occasions in December, 1944 and January, 1945, substantial sums of money were paid to him by Harry Fleisher, totalling

$300 or $400.  Even though it be conceded that there was perhaps some slight variation in the prosecutor's statement from the literal testimony, we do not find that it in any way misled the jury or resulted in prejudice to any of the defendants.

Complaint is also made that the prosecutor in his examination of Jeannette Welker made "improper statements." This woman knew and associated rather intimately with some of the defendants.  She was a hostile witness and the prosecutor, incident to his examination, questioned her about the contents of testimony she had given before the grand jury.  For approximately a month prior to the commencement of this trial this witness, because of her inability to give bail, had been detained in the county jail as a precaution for procuring her presence and testimony at the trial.  It is only fair to infer that the prosecutor had hoped to develop material testimony in support of the people's case by this witness.  Such a result was not accomplished in any appreciable degree.  During the taking of her testimony there was much controversy between the prosecutor and defendants' counsel; and finally after consultation between court and counsel the portion of this testimony to which defendants' counsel most seriously objected was stricken from the record. Thereupon the court instructed the jury:

"As to the testimony of Jeanette Welker, you may consider that part that told about the association between Pete Mahoney and Harry Fleisher, but as to the last part of the testimony where she told of her conversation about Senator Hooper's murder, all that is stricken.  I don't want you to consider that at all.  Any testimony the court strikes out you should not consider."

The serious objection urged by defendants' counsel as to the controversial part of the testimony of Jeannette Welker was that statements claimed to

have been made by her in the presence of Harry Fleisher, or by him, did not amount to admissions against his interests as being indicative of his guilt. This phase of her testimony having been stricken and the jury specifically advised that it should be disregarded by them, the defendants' rights were not prejudiced by what occurred at the trial incident to taking the testimony of Jeannette Welker.

Defendants also assert they were deprived of a fair trial in consequence of the following occurrence. During the latter part of the trial there were released to the public press from the office of the State attorney general at Lansing, on four successive days, July 23 to July 26, instalments of a report of an investigation by the attorney general's department which disclosed maladministration of the affairs of the State prison of southern Michigan. This report led to the publication in many newspapers, including the paper published at the place of trial, of rather sensational articles. At least three of the defendants and also Henry Luks, who was one of the people's principal witnesses, were referred to in the published articles as having criminal records and as possibly having some connection with the Hooper murder. When the publication of the first two issues of this series of articles came to the attention of counsel and the trial judge, a thorough investigation was made and testimony was taken in the absence of the jury concerning these publications, and other publications which occurred prior to those relative to the attorney general's report. Incident to this investigation defendants' counsel made a motion for a mistrial, claiming that in consequence of these publications a fair trial by an unprejudiced jury could not be had. Throughout the trial the jurors were repeatedly directed by the circuit judge to desist from reading newspapers and also cautioned against listening to radio reports. The inquiry discloses that the of-

ficer who had charge of the jury found in the toilet connected with the jurors' room some newspapers, but so far as the record discloses these papers contained nothing relative to the prison investigation, although one of them, the Detroit Free Press of July 18, 1945, reviewed the opening statement of the special prosecutor in the instant case, which, of course, had already been made in the presence of the jury. The denial by the circuit judge of defendants' motion for a mistrial, for reasons indicated by the judge, was proper. In so ruling he said:

"You (defendants' counsel) are alleging some things are prejudicial to your clients. There has nothing been shown yet that they have been prejudiced. The articles read in the court here (in the jury's absence)—that they have been brought to the attention of the jurors has not been shown, that they were. We are all supposing that if they were, they would prejudice their judgment. * * * They have told me repeatedly in court that they would not read newspapers or do anything outside which would influence their determination in the case. * * * There has been no showing here that the jurors will be biased by the report. It is unfortunate that the attorney general at a time like this, when the case is going on, has seen fit to hand out this report, but I don't think this jury will be prejudiced by it. They are fairminded. I believe the court can give them a charge that will be fair to these defendants (which later was done) and the matter will be decided under the law and the evidence as given in open court. I feel, under the circumstances, it is my duty to deny this motion for a mistrial at this time."

The record in the instant case is very materially different from that in *People* v. *Levey,* 206 Mich. 129, cited by defendants in support of their contention that their motion for a mistrial should have been granted. In the *Levey Case* during the course of the trial it was made known to the trial judge that a

member of the jury was improperly approached and sought to be influenced, and that the juror communicated that fact to other members of the jury. Thus it appeared that the attempted extraneous influence actually got to the jury, and in the course of the trial the trial judge was advised thereof. Such a showing, or one comparable thereto, was not made in the instant case.

Another ground of complaint made on this appeal by defendants is the prosecution's "Failure to call *res gestae* witnesses." Relative thereto defendants in their brief say:

"The prosecution knew the names of witnesses who were present at O'Larry's Bar on the occasion when its principal witnesses alleged (and testified) they were promoting this conspiracy with defendants in the presence of said witnesses; and also the names of the girls in Lansing who were contacted by Luks to make a telephone call. They were not offered as witnesses despite the low character of the witnesses who were called to prove these matters."

This was not a crime of violence. The character of the offense here charged is not such as gives rise to the inference that other persons present somewhere in O'Larry's place of business either saw or heard anything that would tend to prove or disprove the alleged conspiracy. It is not disclosed by this record that any of such other persons at O'Larry's Bar could or would give any material testimony in this case. As to two Lansing girls, all the record discloses is that, according to Luk's testimony, while at the Rustic Village Bar in Lansing he requested one of them to phone for him and tell defendant Selik that Luks would not return to Detroit as had been tentatively prearranged. The first girl requested to do the telephoning declined, but the other girl upon being asked to do so by Luks did telephone the message to Selik. There is competent testimony

in the record that Selik said he received the communication. Neither of these Lansing girls were *res gestae* witnesses in the sense that the prosecution was obligated to produce them in court.

On this phase of the case the following is also stated in appellants' brief:

"The only way any testimony about the presence of Mahoney in the Top Hat in Albion could be admissible was on the theory that it was part of the *res gestae*. The prosecutor made no offer to produce any regular patron of the place, but relied on the suspiciously opportune testimony of the bar maid."

There is no showing whatever in this record that any so-called "regular patron of the place" was possessed of any knowledge which would be material to the trial of this case. Instead, so far as the record discloses, the only person able to testify as to Mahoney's presence in the Top Hat at Albion was the bar maid, Evelyn Iris Brown. She was a witness at the trial of the case and testified at length under direct and cross-examination.

In holding that error did not result from the people's failure to indorse and call as *res gestae* the persons to whom reference is above made, it would seem sufficient to note that, so far as the record discloses, no application was made at the trial that these witnesses, or any of them, should be indorsed on the information and produced by the people as *res gestae* witnesses. We find no error in this record by reason of the people having taken testimony of any witness whose name was not indorsed on the information, or in consequence of the failure of the people to produce the witnesses whose names were so indorsed. Defendants' claim of error in the respect just above considered is wholly without merit. See *People v. Higgins*, 127 Mich. 291; *People v. Kayne*, 268 Mich. 186; and *People v. Bartlett*, 312 Mich. 648.

Further, in view of our disposition of this case as to defendant Mahoney, much of this phase of the appeal becomes inconsequential.

In this rather lengthy trial, resulting in a somewhat voluminous record, defendants complain of only four instances of admission of testimony over their objection which they assert resulted in error. These alleged errors should be viewed in the light of the law which, we think, may be stated in substance as follows: In conspiracy cases it is quite impossible to formulate a precise rule of evidence as to what testimony is and what is not admissible as being competent and relevant. Within reasonable bounds the rulings of this character are within the discretion of the trial court and in the absence of a showing of prejudicial error such rulings do not afford a ground of reversal.

"In the reception of circumstantial evidence great latitude must be allowed. The jurors should have before them and are entitled to consider every fact which has a bearing on and a tendency to prove the ultimate fact in issue and which will enable them to come to a satisfactory conclusion. Many facts of no consequence in isolation may be proved because of the persuasiveness of their united effect." 15 C. J. S. Conspiracy, § 92 (b), p. 1141.

Defendant's first objection of the character now under consideration is stated in their brief as follows: "Over defense objections, the court admitted evidence that a warrant had been issued as a result of the Ingham county grand-jury investigation against one Frank McKay, charging him and other codefendants (but not the defendants in this case) with conspiracy to bribe legislators." We are not in accord with defendants' assertion that, "There was absolutely nothing in the rest of the testimony in this case to connect these defendants with Frank McKay or his codefendants in said Ingham county

case." The prosecution stated that in offering this testimony its purpose was to establish a motive, meaning a motive for entering into the alleged conspiracy in the instant case. The prosecutor's theory that this conspiracy case was related to the above mentioned Ingham county grand-jury investigation was by no means wholly without support in the testimony produced by the prosecution. Circumstances were disclosed by the testimony from which a jury might well have been asked to draw such conclusion in that respect as in its judgment was justified. Without objection, concerning the alleged conspiracy, a witness in behalf of the prosecution testified: "I asked if this was anything pertaining to the grand jury in Lansing. Mike Selik told me 'Never mind.' I asked if Frank McKay was involved. Mike told me, 'Never mind, the money is up.' " The record also discloses that in the course of the conspiracy it was stated in substance that it was necessary to accomplish the murder of Hooper within a limited time, which was a few days prior to the adjourned date of the examination in the criminal case which grew out of the Ingham county grand-jury investigation and in which it was anticipated Hooper's testimony would be taken. In view of the foregoing, and other circumstances disclosed by the record, we find no error in the ruling of the circuit judge in the particular now under consideration.

The three remaining complaints as to erroneous admission of testimony, much of which was stricken and the jury instructed to disregard it, concern (1) testimony as to guns, the contemplated use of which in connection with the alleged conspiracy was not shown; (2) criminal record of certain defendants; and (3) the rather intimate relations and associations of defendant Harry Fleisher, a married man, with the witness Jeannette Welker. We do not find in any of these respects there was prejudicial error

and therefore we comment on this phase of the record only as follows:

The testimony as to the guns, of which complaint is made, had to do with incidents which occurred in or near O'Larry's barroom, which the record discloses was a common meeting place of those claimed by the prosecution to have been connected with the alleged conspiracy. Admittedly some of this testimony was irrelevant. When that developed all such testimony given by witness Butler was stricken and the jury instructed to disregard it. Some other testimony of like character which was not stricken could not have prejudiced defendants because, among other reasons, the record is that defendants had weapons of like character suitable to carry out the plan and purpose of the alleged conspiracy, and that such weapons, at least in some instances, were kept, with the seeming purpose of secreting them, at O'Larry's Bar by those engaged in the alleged conspiracy. The challenged testimony as to guns, in view of ample competent testimony of defendants possessing or having access to guns in connection with this conspiracy, was not prejudicial in any appreciable degree.

In considering defendants' contention of error in consequence of testimony having been received which disclosed that certain of them had previously been committed to penal institutions, we are mindful that none of the defendants testified in the instant case. There is no disposition to depart from the rule which in general is that as to a defendant who does not testify in his own behalf, evidence of former convictions or offenses is not admissible except in cases wherein such evidence is material and relevant to the issue being tried. In the instant case the people's witness, Henry Luks, testified that he first met defendant Mike Selik at Jackson prison; and the people's witness, Abramowitz, testified that

he first met Selik at the Michigan reformatory at
Ionia. The prosecutor's purpose in offering this
testimony was obviously to show the relationship
that a jury might infer existed between Selik, Luks
and Abramowitz, which was germane to the people's
case. Under all the circumstances disclosed by the
record, the admission of this testimony was proper.
It was competent and material to a full and fair
presentation of the people's case.

Defendants complain of a somewhat similar inci-
dent which occurred during the testimony of Harry
Richards, Jr., a witness for the prosecution. Rich-
ards operated a motor sales shop in Albion. He had
known Sam Fleisher when some years earlier the
latter had a junk business in Albion. Sam Fleisher
on January 9 or 10, 1945, had a conversation with
Richards at the latter's place of business. This
occurred only a day or so before Hooper was mur-
dered. Evidently for the purpose of showing that
Sam Fleisher at that time had no particular legiti-
mate purpose for being in Albion, and disclosing
facts from which an inference might be drawn that
his presence in Albion was incident to carrying out
the alleged conspiracy, the witness Richards was
questioned quite in detail as to the conversation, and
finally was asked: "Now tell us this: Have you
exhausted your recollection concerning the conversa-
tion you had with him (Sam Fleisher)?", to which
the witness replied, "Well, he just told me his ex-
perience at Alcatraz." Defendants' counsel immedi-
ately interposed an objection and, in the absence of
the jury, moved for a mistrial. The record fairly
discloses that the court struck the answer as to
Alcatraz, and in his general charge he emphatically
stated to the jury that they should disregard all
matters stricken. The motion for a mistrial was
denied. We think the record does not justify the
conclusion that this improper testimony was de-

liberately injected into the case by the prosecutor. During the course of the argument concerning this phase of the record, the prosecutor said: "I say to this court and counsel, it was not my intention to bring out from this witness, things which if I did know I had completely forgotten. I had no intention of bringing out anything about Alcatraz." Inadvertent irregularities of this character are bound to occur in the course of prolonged, hotly-contested trials, and when, as in the instant case, the objectionable testimony is purged from the record by the trial court, the irregularity should not be held to constitute reversible error in the absence of a persuasive showing of prejudice. In the instant case the incident did not constitute a ground for reversal.

Defendants remaining complaint of erroneous admission of testimony is stated in their brief as follows:

"The prosecution introduced incompetent testimony that defendant Harry Fleisher, a married man, had paid the rent for an apartment for a young woman witness (Jeannette Welker) and that he frequented the apartment, and often went out with her, and that she left more desirable occupations and took a position at O'Larry's Bar to be near him. The testimony was admitted over objection for the purpose of 'showing the relation between this witness and Harry Fleisher.' "

The record shows that the testimony above referred to was offered by the prosecution for another purpose than as "showing the relation between this witness and Harry Fleisher." The prosecutor announced that one of his purposes in taking the testimony was to show that Jeannette Welker was a hostile witness. The major portion of the testimony inferentially referred to in the immediately preceding quotation from defendants' brief was taken without any objection being made thereto. The first

objection by defendants was to the witness being questioned as to whether Harry Fleisher paid or furnished the money with which to pay rent for the witness' apartment. Later defendants objected to the witness being asked: "Why did you leave the position as secretary of an advertising concern to take over the kitchen at O'Larry's Bar?" All of this occurred before the trial judge finally ruled, in accordance with the prosecutor's contention: "I shall declare her a hostile witness." This testimony was clearly competent and justifiably taken in support of the prosecution's contention that Jeannette Welker was a hostile witness in this case wherein Harry Fleisher was a defendant. No prejudicial error was committed by taking this testimony.

Appellants also assert error in that their right of cross-examination in a number of instances cited in their brief was unduly restricted by the trial court. Our review of the record fully satisfies us that ample latitude of cross-examination by the defendants was permitted. There is no merit to this asserted ground of error.

"The discretion of the trial judge controls the nature and extent of the introduction of collateral matters upon cross-examination and will never be reviewed except in cases of abuse and this will not be lightly inferred. 1 Greenleaf on Evidence (8th Ed.), §§ 446–448; *People* v. *McArron,* 121 Mich. 1. The discretion of the trial court upon the subject of cross-examination on collateral matters is not subject to review unless it is shown to have been grossly and oppressively abused. So far as the cross-examination of a witness relates either to facts at issue or relevant facts, it is a matter of right; but when its object is to ascertain the accuracy or credibility of a witness, its method and duration are subject to the discretion of the trial judge and, unless abused, its exercise is not the subject of review." *People* v. *MacCullough,* 281 Mich. 15, 24.

There is no merit to the contention of the defendants whose convictions are affirmed that they, or any of them, were prejudiced or denied the right of a fair trial in either of the following particulars: (1) Failure or refusal of the trial judge to give certain charges to the jury as requested by defendants, or (2) That there was prejudicial error in the charge as given. In part defendants' requests were literally given to the jury, and all other phases of defendants' requests, insofar as they were proper, were adequately covered by the charge given. The charge obviously was carefully prepared, and in a most commendatory manner gave to the jury a clear, understandable and complete statement of the law in the light of which decision by the jury should be reached. Careful review of the charge convinces us there was no prejudicial error therein nor in the statement of the court made in response to a question by a juror at the close of the court's charge.

Thus far in this opinion we have considered the record on appeal entirely apart from errors asserted in behalf of defendant Pete Mahoney. Solely in his behalf it is contended (1) that the court was in error in denying the motion made in advance of the trial to quash the information and dismiss the case as against defendant Mahoney; and also (2) that the trial court was in error as to Mahoney in denying defendants' motion made at the close of proofs to direct a verdict of not guilty.

In his charge to the jury the circuit judge properly said: "I charge you, members of the jury, that as far as the evidence in this case against the defendant Pete Mahoney is concerned, it is solely circumstantial." Hence, it is essential to decision of Mahoney's contention that as to him the trial court should have directed a verdict of not guilty, that we ascertain whether circumstances were disclosed by the testimony which could justify the jury in find-

ing beyond a reasonable doubt that Mahoney was guilty. A detailed reference to all of the testimony tending to disclose the claimed incriminating circumstances relied upon by the prosecution as establishing Mahoney's guilt is contained in the circuit judge's charge to the jury, and we quote it practically in full:

"It is the further claim of the people that * * * during the early morning hours of December 26th, Sammy Abramowitz, together with other persons, entered O'Larry's Bar taking a seat in a corner of the bar where certain friends and associates of the defendants Harry Fleisher and Mike Selik usually congregated, and that the defendants Harry Fleisher and Mike Selik were seated together at a table in the opposite end of the room. That the witness Henry Luks joined them and the defendant Pete Mahoney met Sammy Abramowitz near a table in the center of the room where the two sat down together and talked for a few minutes, at which time the defendant Pete Mahoney called to the defendant Mike Selik and requested him to come over to that table; that the defendant Mike Selik complied with the request and, upon coming to that table, the defendant Pete Mahoney immediately left, whereupon the defendant Mike Selik begun at once to talk with the witness Sammy Abramowitz about 'rubbing out' a certain politician who had talked before the grand jury at Lansing. * * *

"It is the further claim of the people that the defendant Pete Mahoney was a close associate and friend of the defendant Harry Fleisher; that the relationship between them was such that when the defendant Harry Fleisher took his girl friend, the witness Jeannette Welker out, the defendant Pete Mahoney frequently went along.

"It is the further claim of the people that on the afternoon of January 11, 1945, the day that Senator Hooper was murdered, the defendant Pete Mahoney came into the Top Hat Tavern in the city of Albion,

Michigan, about 1:30 o'clock fast time, in company with an unidentified man, sat down at a booth on the north side of the tavern, to the rear of which was a pay-station telephone. That the defendant Mahoney was nervous, that he and the unidentified man bought three or four bottles of beer each, out of which they drank a part of the contents, leaving about one-third thereof. That the defendant Pete Mahoney went to the toilet two or three times, looked at what appeared to be his watch, repeatedly looked at the clock on the wall, and asked the proprietor of the tavern, the witness (Evelyn Iris) Brown, whether or not the clock was fast or slow time. That said unidentified man, sitting with the defendant Pete Mahoney, kept his hat pulled down over his face and his left hand up to his face so that his face was not seen clearly by the witness Brown. That the defendant Mahoney and said unidentified man remained in the tavern for approximately an hour."

It cannot be overlooked that there is no testimony of any of the other parties to the conspiracy ever having spoken to Mahoney about it, or that he ever said anything to them or to any other person indicating that he even knew of the conspiracy. There is no testimony that there was ever an overt act on the part of Mahoney incident to the conspiracy. Surely it is not sufficient that the testimony discloses Mahoney's presence in the O'Larry barroom where others planned concerning the conspiracy, there being no testimony that Mahoney took any part in the planning or that he had any knowledge thereof, notwithstanding there is testimony of a friendly relation between Mahoney and Harry Fleisher. Nor is it sufficient that, in addition to the foregoing, there is testimony that Mahoney was in an Albion beer parlor with an unidentified man on the afternoon of the day Hooper was murdered, several miles distant from Albion. Each and all of the circumstances relied upon by the prosecution are as consistent with

Mahoney's innocence as with his guilt. While as to other defendants the trial judge correctly denied their motion to direct a verdict, the record necessitates the holding that as to Mahoney, the motion to direct a verdict of not guilty should have been granted by the trial judge.

Careful consideration has been given to numerous other errors asserted by defendants, but we find in them no justification for reaching any other conclusion than that the defendants whose convictions we herein affirm were not deprived of due process of law or of their right to a fair trial in consequence of any prejudicial error. The conviction and sentence of each of the defendants, except Peter Aposteopolos, alias Pete Apostolapos, alias Pete Mahoney, is affirmed; but as to Peter Aposteopolos, alias Pete Apostolapos, alias Pete Mahoney, his conviction is set aside without a new trial.

Bushnell, C. J., and Sharpe, Boyles, Reid, and Butzel, JJ., concurred.

Dethmers and Carr, JJ., did not sit.